UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA                 :
                                         :
                                         :
   -against-                             :
                                         :          12 CR  659 (LAK)
                                         :
EVAN ZAUDER,                             :
                                         :
                                         :
                        Defendant. :
--------------------------------------------------------x


### SENTENCING MEMORANDUM ON BEHALF OF EVAN ZAUDER

**Benjamin Brafman, Esq.**
**Joshua D. Kirshner, Esq.**
Brafman & Associates, P.C.
*Attorneys for Evan Zauder*
767 Third Avenue, 26th Floor
New York, New York 10017
Tel (212) 750-7800
Fax (212) 750-3906
E-mail:  bbrafman@braflaw.com
             jkirshner@braflaw.com

## I.   <u>PRELIMINARY STATEMENT</u>

Defendant Evan Zauder, through his counsel, respectfully submits this Sentencing Memorandum to assist the Court in determining an appropriate sentence following Evan Zauder's guilty plea to one count of Enticement of a Minor, in violation of 18 U.S.C. § 2422(b); one count of Transportation, Receipt and Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(A)(a)(1) and (a)(2)(B); and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(5)(B).   Mr. Zauder is scheduled to be sentenced on December 18, 2013 at 3:00 p.m.

## II.   <u>INTRODUCTION</u>

As a consequence of his guilty plea to Enticement of a Minor, Evan Zauder faces a mandatory minimum sentence of 10 years in prison.  We respectfully seek the mandatory minimum sentence of 10 years.  Ultimately, 10 years is a sentence that, in our judgment, is *more* than "sufficient" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2).

As discussed below, Evan understands the seriousness of the grave offenses he has committed.  In this case, however, his conduct, though serious, does not equate with the draconian prison term that is reflected by the advisory United States Sentencing Guidelines.  As discussed more fully in section III.,C of this Memorandum, the advisory Guidelines range in this particular case is not reflective of an appropriate sentence.  Indeed, we anticipate that the government will acknowledge the inflated state of the Sentencing Guidelines ranges in matters

such as this and will agree that a Guideline sentence would not be appropriate in the case of Evan Zauder.[1]

Evan Zauder's application to be sentenced to the minimum sentence is not an appeal only to sympathy, but also to reason, as it balances the crimes he has regrettably committed with the extraordinary amount of good he has already accomplished in a mere 27 years.  It also factors Mr. Zauder's unique and tragic familial circumstances, his serious treatment that began shortly after his arrest, and, as Your Honor discussed at his plea, what appears to be the unconscionable discrepancy in amount of jail he would have been exposed to for the same criminal conduct had he been prosecuted by New Jersey state authorities as opposed to Federal authorities.

For these compelling reasons, we respectfully submit that the mandatory minimum sentence of 10-years imprisonment is more than sufficient punishment for a young man who, despite his flaws, nevertheless has many redeeming qualities.

### III.    THE COURT'S INQUIRES

At Mr. Zauder's plea, Your Honor directed the parties to apprise the Court of the jail sentence Evan Zauder would have actually served had he been prosecuted for the conduct underlying Count One at the state level in New Jersey.  The Court also asked the parties to confirm that the practices of its "colleagues" were consistent with the very high percentage of below Guideline sentences (both where the government advocated for and opposed a below

---

[1] The Probation Department has concluded in its initial draft of the PSR that the appropriate advisory guidelines range is 168 to 210 months, substantially below the range in the plea agreement.   Even if Your Honor accepts Probation's calculation, it still provides for a sentence substantially beyond the 10-year mandatory minimum, and we ask the Court not to exceed the mandatory minimum period.

Guidelines sentence) in child pornography cases reflected in the most recent year's Sentencing Commission statistics.

At the Court's request, we have confirmed that District Courts routinely struggle with the inflated state of the advisory Guidelines ranges in child pornography cases. We have also analyzed the applicable section of the Guidelines, and we respectfully submit that the advisory range in this case are not reflective of an appropriate sentence and, accordingly, are entitled to significantly less deference than in the average criminal matter before Your Honor.

## A.     New Jersey Law

In New Jersey, the statute applicable to the conduct underlying Count One is Sexual Assault, which provides, in pertinent part, that "[a]n actor is guilty of sexual assault if he commits an act of sexual penetration with another person . . . [and] the victim is at least 13 years old but less than 16 years old and the actor is at least four years older than the victim." N.J.S.A. 2C:14-2(4).   In New Jersey, Sexual Assault is a second-degree crime that exposes a person convicted of that crime to a term of imprisonment that "shall be fixed by the court and shall be between five years and 10 years." N.J.S.A. 2C:43-6(a)(2).

As Your Honor is aware, in this case, Evan Zauder faces a mandatory minimum of 10 years and a maximum of life in prison. Accordingly, Evan's exposure being prosecuted in the Southern District of New York is far more severe than the exposure he would face had he been prosecuted in the New Jersey state criminal justice system.

This frightening contrast turns even more stark when one considers that, in New Jersey, Evan Zauder would also be eligible for parole. Thus, the following chart demonstrates

the earliest and latest parole eligibility[2] for the prison terms available to Evan for any sentence between five and 10 years:

| Sentence (years) | Earliest Eligibility[3] | Latest Eligibility[4] |
|---|---|---|
| 5 | 1 year, 5 days | 1 year, 3 months, 25 days |
| 6 | 1 year, 2 months, 13 days | 1 year, 6 months, 29 days |
| 7 | 1 year, 4 months, 18 days | 1 year, 9 months, 27 days |
| 8 | 1 year, 6 months, 25 days | 2 years, 23 days |
| 9 | 1 year, 9 months, 1 day | 2 years, 3 months, 23 days |
| 10 | 1 year, 11 months, 5 days | 2 years, 6 months, 21 days |

It should also be noted that a sentencing court in New Jersey "may fix a minimum term not to exceed one-half of the [prison] term set . . . during which the defendant shall not be eligible for parole." N.J.S.A. 2C:43-6(b). The court, however, has this discretion only when it is first "clearly convinced that the aggravating factors substantially outweigh the mitigating factors, as set forth in subsections a. and b. of 2C:44-1"[5] or where court finds "there is a substantial likelihood that the defendant is involved in organized criminal activity." *Id.*

Thus, even in the highly unlikely event that a New Jersey sentencing court sentenced Evan to the maximum term of 10 years and also fixed the maximum minimum term of five years, he would be eligible for parole after five years. Given Evan's sterling background and lack of any prior record, if he were prosecuted for the conduct underlying Count One in New Jersey, he would, in our judgment, be eligible for parole after serving somewhere between just over one year and, at most, five years.

---

[2] Assuming no mandatory minimum sentence is set by the sentencing judge.

[3] The earliest eligibility includes commutation credit, the max number of work credits, and the max number of minimum custody credits.

[4] The latest eligibility dates includes commutation credits, but does not include any work or minimum custody credits.

[5] Some of the factors include the nature and circumstances of the offense, the risk that the defendant will commit another offense, the extent of the defendant's prior criminal record and the seriousness of the offenses of which he has previously been convicted. For an exhaustive list, see N.J.S.A. 2C44-1 a. and b.

**B.**     **Child Pornography Statistics**

A comprehensive review of post-*Booker* child pornography cases leads to the conclusion that the practices within this District are consistent with the very high percentage of below Guidelines sentences for child pornography cases reflected in the most recent year's Sentencing Commission statistics.  *See, e.g., United States v. David Santana*, 08 Cr. 1112 (LAK) (imposing sentence of 24 months' incarceration despite Guidelines range of 97-120 months, in case where defendant emailed images of child pornography to undercover agent and engaged in phone calls and online chats); *United States v. Ira Kemp,* 09 Cr. 658 (JSR) (imposing 60 months' incarceration despite Guidelines range of 210-262 months, in case where defendant sent images to others and had chats online looking for minors); *United States v. Hector Garcia*, 10 CR 914 (BSJ) (imposing sentence of 5 years' probation despite Guidelines range of 87-108 months).

District courts have even imposed sentences of probation or time served in similar cases despite relatively high guidelines ranges.  *See, e.g., United States v. Michael Jin*, 09 Cr. 678 (RJS) (imposing probation, despite Guidelines range of 57-71 months); *United States v. Robert Santana*, 10 Cr. 341 (SHS) (imposing probation, despite Guidelines range of 51-63 months); *United States v. Jason Arberger* (08 Cr. 894) (AKH) (imposing probation, despite Guidelines range of 41-51 months); *see also United States v. Malakoff*, 09-Cr. 051-ESH-1 (D. D.C. July 19, 2009) (Sentencing the defendant in a child pornography case to five years probation despite a Guidelines range of 78-97 months).

In addition, Circuit Courts throughout the country have upheld below-guideline sentences in child pornography cases when the facts considered pursuant to 18 U.S.C. § 3553(a) warranted such a sentence.  *See United States v. Stall*, 581 F.3d 276, 286, 289 (6th Cir. 2009) (upholding as substantively and procedurally reasonable a sentence of one days of incarceration

and ten years of supervised release in case with Guidelines range of 57-71 months), *United States v. Duhon*, 541 F.3d 391, 399 (5th Cir. 2008) (upholding as substantively reasonable a sentence of 5 years' probation in case with guidelines range of 27-33 months), *United States v. Rowan*, 530 F.3d 379, 381 (5th Cir. 2008) (upholding as "appropriate" sentence of 5 years' probation, imposed following consideration of 3553(a) factors, in case where guidelines recommended a sentence of 46-57 months' incarceration).

We are also aware of those cases that involved sexual contact and/or production of child pornography where the imposed sentences approached or were within the sentencing Guidelines ranges.  Those cases, however, we submit, are very distinguishable from Evan Zauder's case.

The cases we anticipate the government will cite are factually distinguishable. For example, the Second Circuit, in *United States v. Broxmeyer,* 699 F.3d 265 (2d Cir. 2012), upheld a post-trial 30 year sentence as substantively reasonable where the defendant had worked for many years as a field hockey coach training female high school athletes in New York, New Jersey, and Pennsylvania.  In that case, the defendant's interaction with the female athletes he coached frequently escalated from the athletic to the flirtatious to the overtly—and coarsely—sexual.  For example, Broxmeyer sent several teenage girls an image of his erect penis, requesting that they provide him with sexually explicit images of themselves or others in return. He maintained the pictures in an electronic album and on two computers eventually seized pursuant to a warrant. The defendant also distributed these pictures to other teenagers to encourage them to produce similar images of themselves or other girls.  The defendant also engaged several teenage girls in a range of sexual conduct, including intercourse and sodomy. The Second Circuit found the lengthy sentence substantively reasonable based on several

aggravating factors including the defendant's repeated abuse of a position of trust conferred on him by "parents and the community" to train and mentor adolescent girls, as well as the defendant's disturbing lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct.  *See also, e.g*, *United States v. Luciano Medez-Rojas*, 11 Cr. 929 (PAE) (June 26, 2013) (Judge Engelmayer sentenced the defendant to 252 months of imprisonment where, among other serious conduct, the case involved the defendant's own young children filming the defendant and their mother having sexual intercourse, touching their own children, and distributing films of them having sex with their children on the film); *United States v. Decker*, 12 Cr. 343 (CS) (May 17, 2013) (Judge Seibel sentenced the defendant to 180 months of imprisonment where, among other serious conduct, the defendant directed a woman to film the sexual abuse of her eight-year-old child and 10-month-old baby and transmit it over the internet to the defendant).

In contrast, although Evan Zauder was in a position of trust with countless students he has taught or supervised over many years, there was never an allegation that he abused that trust.  In addition, as demonstrated in his own letter (Ex. 53) and the report of his therapist, Dr. Meg Kaplan (Ex. 56), Evan Zauder has demonstrated extreme remorse, accepted full responsibility, and is taking serious steps towards resolving the issues underlying his conduct.  In general, the facts surrounding Evan's case, while serious, are nevertheless far less severe and cannot be compared to the horrific facts in *Broxmeyer* or other similar cases.

Furthermore, we respectfully submit that Evan Zauder's extraordinary personal history and characteristics, his supportive network of family and friends, and the profound and extensive treatment that is already underway set him apart from the defendants in most, if not all, of the cases in which severe sentences were imposed.   Indeed, as is clear in the more than 50

letters submitted to this Court and annexed as exhibits to this Memorandum – coupled with the findings of all three examining experts, including the court-appointed expert – Evan Zauder is an intelligent and thoughtful young man who comes from a supportive network of family and friends and "through his specialized treatment, Mr. Zauder appears to have reexamined his pro-offending attitudes and is ably working to manage his sexual interest . . . [he] appears to understand his strongest risk factors related to reoffending and appears committed to living a life that is free from any future criminal activity."   (Ex. 59 Dr. Must Report, at 13).  Though our information is limited as to other defendants' personal circumstances, we believe that Evan's extraordinarily positive attributes are unique amongst this subset of criminal defendant.


**C.**  **The Sentencing Guidelines Are Less Reflective of an Appropriate Sentence Than Other Portions of the Sentencing Guidelines**

The parties have agreed that, based on the application of Section 2G2.2 of the United States Sentencing Guidelines, the applicable guidelines range in this case is 262 to 327 months incarceration.  It is abundantly clear, however, in the calculation utilized to arrive at this number that, while the mandatory minimum in Evan Zauder's case is driven by Count One, the extremely high guidelines calculation is largely a result of how Counts Two and Three are calculated under Section 2G2.2.   Although the Court must consider this range as part of its analysis pursuant to 18 U.S.C. § 3553(a), we submit that in this case Section 2G2.2 is less reflective of an appropriate sentence and is therefore entitled to less deference because (1) it is not based on empirical data and in the judgment of the Sentencing Commission in its institutional role, (2) the "enhancements" contained in Section 2G2.2 actually reflect factors inherent in most cases involving the possession of child pornography, and (3) the guidelines

"irrationally" result in recommended sentences at or near the statutory maximum even for first-time offenders.

Finally, we respectfully note that, following several years of research, the Sentencing Commission recently issued a comprehensive report on § 2G2.2.  United States Sentencing Commission, Report to Congress:  Federal Child Pornography Offenses (Dec. 2012), available at: http://www.ussc.gov/Legislative_and_Public_Affairs/ Congressional_ Testimony_ andReports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/Full_Report_to _Congress.pdf(last assessed October 30, 2013) ("Comm. Rep.").  The commission concluded that "the current sentencing scheme results in overly severe guidelines ranges for some offenders based on outdated and disproportionate enhancements related to their collecting behavior." Comm. Rep. at 321.

Indeed, recently, in *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010), the Second Circuit recognized "certain serious flaws in U.S.S.G. § 2G2.2," and the Court pointed out that U.S.S.G. § 2G2.2 "is fundamentally different from most [Guideline sections] and that, unless applied with great care, [it] can lead to unreasonable sentences that are inconsistent with what § 3553 requires."  *Id.* at 184.

## 1.    Section 2G2.2 is not empirically-based

Where a particular guideline "do[es] not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role" of establishing guidelines using an empirical approach based on data regarding past sentencing practices, a Court is free to disagree with that guideline.  *See Kimbrough v. United States*, 552 U.S. 85, 89 (2007)

Section 2G2.2 of the Sentencing Guidelines applies to cases involving child pornography.  This guideline, however, like the crack cocaine guidelines considered in

*Kimbrough*, is "not representative" of the Sentencing Commission's "typical role or empirical study."  *United States v. Hanson*, 561 F. Supp. 2d 1004, 1009 (E.D. Wisc. 2008).  Indeed, the Second Circuit observed that "the Commission did not use [an] empirical approach [based on data about past sentencing practices] in formulating the Guidelines for child pornography."  *Dorvee*, 616 F.3d at 184.  Moreover, this "guideline has been steadily increased despite evidence and recommendations by the [Sentencing] Commission to the contrary."  *Hanson*, 561 F. Supp. 2d at 1009; *see also Dorvee*, 616 F.3d at 184.  The Court in *Dorvee* went on to note that these Congressional directives represent "a 'blatant' disregard for the Commission and are 'the most signficant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress.'"  *Dorvee*, 616 F.3d at 184 (quoting Alan Vinegrad, The New Federal Sentencing Law, 15 Fed. Sent. R. 310, 315 (June 2003)).

In reality, the child pornography guidelines are "keyed to policy and statutory mandates," not to any empirical information in the hands of the Sentencing Commission.  *See United States v. Baird*, 580 F. Supp. 2d 889, 893-94 (D. Neb. 2008); *see also United States v. Grober*, 595 F. Supp. 2d 382, 392 (D.N.J. 2008), *United States v. Johnson*, 588 F. Supp. 2d 997, 1003-04 & n.4 (N.D. Iowa 2008) (noting that "as far as this Court can tell, these modifications [to 2G2.2] do not appear to be based on any sort of empirical data"), *Hanson*, 561 F. Supp. 2d at 1009, *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) (explaining that U.S.S.G. 2G2.2 was "not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives" and that the court was "unable to locate any particular rationale for [2G2.2's enhancements] beyond the general revulsion that is associated with child exploitation offenses").

We submit that because 2G2.2 is not "empirically-grounded," it is entitled to less deference, and is a less-reliable indicator of a fair sentence pursuant to § 3553(a), than other, empirically-grounded guidelines.  See *Kimbrough*, 128 S. Ct. at 574, *Grober*, 595 F. Supp. 2d at 393-94 (quoting Shipley, 560 F. Supp. 2d 739, 745-46).

> **2.    "Aggravating Factors" Are Actually Inherent in the Offense and Should Not be Used to Enhance the Sentencing Range**

Beyond the lack of an empirical foundation, 2G2.2 is further flawed because it fails to effectively differentiate between the nature and circumstances of different offenses.  The so-called "aggravating factors" by which 2G2.2 increases a defendant's offense level "in reality define the core of the offense – transmitting child pornography by file sharing and, on occasion, attaching it to emails."  *Id.* at 396.  In other words, factors such as the use of a computer, the presence of more than 600 images, and images of prepubescent minors, some engaging in sexual activity, "are actually inherent in the possession of child pornography."  *Id.* at 397, 403 (holding that Grober's conduct was "squarely within the heartland of downloading cases," but nevertheless declining to sentence him within the range recommended by 2G2.2 because "§ 2G2.2, the designated guideline for the typical downloading case, is what falls outside the heartland.").

As the Second Circuit noted in *Dorvee*, the "enhancements" that would increase Evan's offense level are present in an overwhelming majority of child pornography cases.  *See Dorvee*, 616 F.3d at 186. In 2009, in cases applying 2G2.2, 94.8% involved 2G2.2(b)(2)'s 2-level increase for images involving a prepubescent minor; 97.2% involved 2G2.2(b)(6)'s 2-level increase for use of a computer; 73.4% involved 2G2.2(b)(4)'s 4-level increase for depictions of

sadistic or masochistic conduct[6]; 63.1% involved 2G2.2(b)(7)(D)'s 5-level increase for 600 or more images.  *Id.*  Nor does the number of images necessarily reflect the seriousness of the offense conduct.  An individual using a high speed internet connection can download 600 images in just a few minutes.  Because these aggravating factors essentially are inherent in the offense conduct, § 2G2.2 "fails to distinguish serious commercial distributors of child pornography from more run-of-the-mill users."  *Id.* (citing Sentencing Commission commentary to Congress).

Accordingly, if Your Honor were to discount the gratuitous aggravating factors that are necessarily inherent in the offense conduct underlying Evan Zauder's guidelines range, his total offense level would be 26 resulting in an advisory guidelines range of 63-78 months, several years less than the mandatory minimum sentence the Court must impose.

### 3. "Illogical" Treatment of First-time Offenders

Yet another compelling reason courts conducting a § 3553(a) analysis have declined to give deference to the child pornography Guidelines is the "illogical" effect of their application as the Guidelines range recommended in the case of an average, first-time offender reaches the statutory maximum.  *See Hanson*, 561 F. Supp. 2d at 1010-11 (describing as "illogical" the guideline's recommendation that first-offenders be sentenced at the statutory maximum).  *See also Grober*, 595 F. Supp. 2d at 394 (prescribes "overly punitive sanctions for a first offender.").   In fact, application of the sentencing guidelines to Evan Zauder's case exemplifies this flaw as Evan, a first-time offender who did not create or sell child pornography, nevertheless faces a guidelines range – 262 to 327 months – which, as a practical matter, approaches that statutory maximum of life in prison.

---

[6] Though these categories technically apply, in the majority of images at issue the fact that the acts portrayed in the images involve minors is what places them in the categories of "sadistic or masochistic", rather than the act itself had it been images of consenting adults.

As the Second Circuit explained in *Dorvee*, "[t]his result is fundamentally incompatible with § 3553(a)." *Dorvee*, 616 F.3d at 187. "By concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the fundamental statutory requirement in § 3553(a) that district courts consider the 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" Id.  Section 2G2.2 also "violates the principle, reinforced in Gall, that courts must guard against unwarranted similarities among sentences for defendants who have been found guilty of dissimilar conduct." *Id.* (citing *Gall*, 552 U.S. at 55, 128 S.Ct. 586).

We respectfully submit that the guidelines in this case are not entitled to deference.  Although, the Court must consider the advisory sentencing guideline range, the remaining factors to be considered pursuant to 18 U.S.C. § 3553(a) lead to the conclusion that a sentence of 10 years in prison is more than sufficient.


### IV. EVAN ZAUDER'S PSYCHOLOGICAL ASSESSMENT AND HIS ONGOING TREATMENT

Shortly after his arrest, a remarkable transformation began to take place for Evan Zauder and his family.  Following the initial shock of his arrest and remand, the seriousness of the charges he faced made it clear to Evan and the Zauder family that they should abandon asking "how did this happen?" in favor of a familial chorus of "how can Evan get better." Thereafter, and during the 19 months that have already elapsed since his arrest, Evan's efforts at treatment – during the ongoing criminal proceedings – have been relentless.[7]  While he has an

---

[7] Paragraphs 15 - 16 of the PSR discuss the circumstances surrounding the revocation of Evan's bail and his remand to custody.  Notably, the conduct that violated the terms of his pretrial release occurred prior to or at the very beginning of his intensive treatment regimen.

advantage over the vast majority of criminal defendants that come before Your Honor in that he has a supportive family unit and an excellent education, his own efforts at discovering and addressing the problems underlying his behavior have been remarkable and quite commendable.


A.      **Dr. Richard Krueger's Psychological Assessment of Evan Zauder**

Owing to these charges, Evan was evaluated by Dr. Richard Krueger, an expert in the field of sexual offenders.   Dr. Krueger is a highly-regarded professional who consults with both the law enforcement community and the defense bar.   (Ex. 57, CV of Dr. Krueger).   Dr. Krueger is a psychiatrist with an expertise in forensic psychiatry, addiction psychiatry, sexual offenders, professional sexual misconduct, and the psychopharmacological and behavioral treatment of paraphilias and sexual disorders.  He is a graduate of Harvard Medical School and an Associate Clinical Professor of Psychiatry in the Department of Psychiatry, Columbia University, College of Physicians and Surgeons. He is also on the faculty of the Columbia-Cornell Fellowship Program in Psychiatry and the Law. He is Medical Director of the Sexual Behavior Clinic at New York State Psychiatric Institute and an attending psychiatrist at New York State Psychiatric Institute and at Columbia-Presbyterian Medical Center. Dr. Krueger is also a board member and President of the New York State Association for Treatment of Sexual Abusers and, notably, is member of the Sexual Health and Disorders Committee of the World Health Organization.

---

Also, since he has been remanded, both counsel and his treating therapist have noticed a significant and positive change in Evan's overall affect, his unrelenting determination to understand and treat his problems, and his goal of making his unavoidable prison term as productive as possible.  While we do not in any way attempt to minimize the conduct that caused him to be remanded, we believe the result has allowed Evan to singularly focus on his treatment and improve his mental health, clarity in judgment and overall positive well being.

In addition to spending a lengthy period of time evaluating Evan, Dr. Krueger has also consulted with counsel and reviewed the allegations, including the materials underlying the charges of conviction.  In summary, Dr. Krueger finds that, ██████████████

████████████████████████████████████████████████

████████████████████████ (Ex. 55, Psychological Report of Evan Zauder).

Specifically, Dr. Krueger's Report concludes the following:

**1.      Evan Zauder Will Not Re-Offend**

Dr. Krueger evaluated Evan at the very early stages of his treatment with Dr. Meg Kaplan.  Critically, Dr. Krueger states:



(*Id.*)

**2.      The Conduct Specifically Underlying Count One Was Likely Caused by the Extreme Grief Evan Was Then Suffering From As A Result of The Death of His Brother**

As discussed in section VI.B.6 below, prior to and during the time period in which Evan Zauder committed the conduct underlying Count One, he was grieving the tragic death of his older brother, Michael.  Evan, though a younger brother, acted as a parent to Michael who suffered from a genetic disease since his birth.  Evan was present when the Zauder family made the decision to take Michael off of life support and this event understandably caused Evan to suffer from profound depression and grief for an extended period of time.

While we do not claim a direct causal relationship is present, Dr. Krueger's observations make it clear that Evan Zauder's involvement with acts that go beyond his

problematic use of images of child pornography was a manifestation of the severe depression and extensive grief he was battling at the time.   Dr. Krueger states:

(*Id.*)

Thus, according to Dr. Krueger, Evan's decision to pursue actual sexual contact with an under-age person appears to have been impulsive and perhaps related to his depression and extensive grief associated with the tragic death of his brother that he was still grappling with as late as May 2011.  (Ex. 54, Journal of Evan Zauder.)

As stated by Dr. Krueger, Evan is not a sexual predator with serious concerns of recidivism.   Rather, he has a                                                                      of teenaged males and cybersexual behavior."  (Ex. 55, Psychological Report of Evan Zauder.)   Accordingly, Dr. Krueger believes the conduct underlying Count One is an aberration to Evan Zauder's admittedly dysfunctional behavior associated with Counts Two and Three.


**B.**     **Evan Zauder's Ongoing Treatment by Dr. Meg Kaplan**

Though remanded since June 8, 2012, Evan has been in treatment with Dr. Meg Kaplan since June of 2012.   Dr. Kaplan, an expert on Compulsive Sexual Behavior and Paraphilias, Sex Therapy, and Human Sexuality Education, is an Associate Clinical Professor of Psychology in Psychiatry at Columbia University's College of Physicians and Surgeons. She has been Director of the Sexual Behavior Clinic at New York State Psychiatric Institute since 1990.

- 16 -

She is a clinical psychologist and sexologist who has specialized in treating sexual disorders since 1985.  (Ex. 58, CV of Dr. Meg Kaplan).

During their extensive therapy sessions and 100+ hours of treatment, Evan and Dr. Kaplan have worked on the following treatment strategies: ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ (*See* ex. 56, October 27 letter of Dr. Meg Kaplan.)

████████████████████████████████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

(Ex. 56, at 2-3.)


C.    **Dr. Must's Report**

At the Department of Probation's request, this Court ordered an additional evaluation of Evan Zauder by Dr. Shoshanna Must.  (Ex. 59).   We agree with much of Dr. Must's report, including, but not limited to her acknowledgement that ██████████████ ████████████████████████████████████████████████████████ ████████████████████████ (Ex. 59, at 15).  We ask the Court, however, to pay particular attention to the October 27, 2013 responsive letter of Dr. Meg Kaplan concerning

some of Dr. Must's conclusions. While a battle of experts is not appropriate where two highly-esteemed professional's opinions concerning Evan Zauder largely overlap, one glaring distinction cannot be ignored: Dr. Must met with Evan Zauder on only two occasions, March 7, 2013 and April 11, 2011. Dr. Kaplan has provided in excess of 100 hours of individual therapy to Evan Zauder. Noting the disparity in amount of time actually spent working with Evan Zauder, we respectfully ask the Court to ignore Dr. Must's suggestion ██████████████

████████████████████████████████████████████████████

████████████████████████████████ (Ex. 56, at 3).

In summary, in the opinion of a world-renowned expert who has spent more than 100 hours with him, Evan Zauder is at low risk for re-offending and has made great strides towards understanding the nature of his problems, reprogramming his behavioral tendencies, and developing and implementing a plan, aided by his therapist, to get better. A sentence in excess of the 10 year mandatory minimum can only serve to unnecessarily disrupt these herculean efforts.

## V. ANALYSIS

### A. The Law Permits a Below Guideline Sentence

#### 1. Guidelines Range

The parties have stipulated to the following Guidelines analysis:

| Category | Points |
|---|---|
| Base Offense Level (Grouped pursuant to U.S.S.G. § 3D1.2(c),(d) (U.S.S.G. § 2G2.2(a)(2)) | 22 |
| Material Involved a Prepubescent Minor (U.S.S.G.§2G2.2(b)(2) | +2 |

| Category | Points |
|---|---|
|  |  |
| Offense Involved Distribution (U.S.S.G.§2G2.2(b)(3)(F)) | +2 |
| Material Portrayed Sadistic, Masochistic, or other Depictions of Violence (U.S.S.G.§2G2.2(b)(4)) | +4 |
| Defendant Engaged in Pattern of Activity Involving Exploitation of Minor (U.S.S.G.§2G2.2(b)(5)) | +5 |
| Offense Involved the Use of a Computer (U.S.S.G.§2G2.2(b)(6)) | +2 |
| Offense Involved 600 or More Images (U.S.S.G.§2G2.2(b)(7)(D)) | +5 |
| Acceptance of Responsibility Adjustment (U.S.S.G. § 3E1.1(a) and (b)) | -3 |
| Total Adjusted Offense Level | 39 |

Evan Zauder has no prior criminal history, therefore his criminal history level for purposes of the Sentencing Guidelines is a Category I. The advisory Guidelines range associated with an adjusted offense level of 39 for an individual with a criminal history Category I is 262 – 327 months imprisonment.

The Probation Department, having used a different grouping of offenses than stipulated by the parties, has calculated a Guidelines sentencing range of 168-210 months' imprisonment. Although prohibited by the terms of the plea agreement from arguing in favor of the Probation Department's calculation, we maintain that the facts and circumstances of this case

- 19 -

and 18 U.S.C. § 3553(a) warrant a mandatory minimum sentence of 10 years' imprisonment, substantially below even the Probation Department's calculation.

### 2.    The Court's Discretion to Vary From the Advisory Guidelines

In *United States v. Booker*, 543 U.S. at 226-46, the Supreme Court held that the then-mandatory Sentencing Guidelines system violated the Sixth Amendment.  As a result, the Court in *Booker* rendered the Sentencing Guidelines merely "advisory."  *Booker*, 543 U.S. at 245.  Later, the Court further clarified its position, holding that in addition to being advisory, the Guidelines "now serve as one factor among several courts must consider in determining an appropriate sentence."  *Kimbrough v. United States*, 552 U.S. at 90.

To be sure, while a sentencing court must begin the process of determining an appropriate sentence for a criminal defendant by calculating the applicable Guidelines range, it "should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party."  *Gall v. United States*, 552 U.S. 38, 49-50 (2007).  Section 3553(a), "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Kimbrough*, 552 U.S. at 101 (citing the sentencing goals set forth at 18 U.S.C. § 3553(a)(2)(A)-(D)).

In 2009, the Supreme Court, in *Nelson*, clearly stated that a sentencing court may not presume that the applicable Guidelines range is reasonable:

> Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable.  In <u>Rita</u> we said as much, in fairly explicit terms: "We repeat that the presumption before us is an *appellate* court presumption. . . . [T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."  And in [<u>Gall</u>] we reiterated that district judges, in considering how the various

statutory sentencing factors apply to an individual defendant, "may not presume that the Guidelines range is reasonable."

. . . . The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.

*Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892 (2009) (citations omitted).

The Supreme Court has since re-emphasized that the Guidelines are advisory and not to be presumed reasonable. *United States v. Peugh*, ---U.S.---, 133 S. Ct. 2072, 2080 (June 10, 2013). In *Peugh*, the Supreme Court once again held that the Guidelines are to be given "respectful consideration" but that the district court should "tailor a sentence in light of other statutory concerns as well." *Peugh*, at 2079-80 (June 10, 2013), (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)). Lest anyone conclude that the Court intended to modify *Booker* and its progeny in *Peugh*, the Court specifically stated that it is not doing anything of the kind, adding that "[n]othing that we say today undo[es] the holdings of *Booker, Rita, Gall, Kimbrough*, or our other recent sentencing cases." *Peugh* at 287 (internal quotations omitted). Accordingly, nothing in *Peugh* alters the existing sentencing regime and the Supreme Court's directive *Nelson* still stands.

Section 3553(a) specifically directs that courts "shall impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]." 18 U.S.C. § 3553(a) (emphasis added). The § 3553(a) factors include the following: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the advisory guideline range; (5) any pertinent policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(1)-(7); *see also Booker*, 543 U.S. at 224.

While a court may impose a Guideline-authorized downward departure in an appropriate case, such downward departure is no longer required in order to justify a below-guidelines sentence. After *Booker*, a sentencing court need not find that a particular § 3553(a) factor is "extraordinary" or sufficient to take a case out of the "heartland" in order to justify a below-guidelines sentence. *See Gall*, 552 U.S. at 47; *United States v. Rita*, 551 U.S. 338, 351 (2007). Even those factors that would not necessarily result in the granting of a downward departure–or that were expressly prohibited or deemed irrelevant by the Sentencing Guidelines– must now be considered under the mandate of § 3553(a). *See United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) ("[J]ust as we may not bar a district court from considering facts simply because they were also considered by the Commission, the district court 'may not presume' the reasonableness of the Commission's Guidelines sentencing ranges. Rather, in every case, the district court 'must make an individualized assessment' of the appropriate sentence 'based on the facts presented' and the factors detailed in § 3553(a)." (citations omitted)) .

A non-Guidelines sentence is also warranted where a sentencing judge finds that a particular Guideline or Guideline range fails to properly reflect § 3553(a) considerations, reflects "unsound judgment" or when "the case warrants a different sentence regardless." *Rita*, 551 U.S. at 351, 357. The Supreme Court recently clarified this point:

> "Even when a particular defendant . . . presents no special
> mitigating circumstances, such as no outstanding service to

> country or community, no unusually disadvantaged childhood, no
> overstated criminal history score, no post-offense rehabilitation, a
> sentencing court may vary downward from the advisory guideline
> range. . . . The only fact necessary to justify such a variance is the
> sentencing court's disagreement with the guidelines . . . ."

*Spears v. United States*, 555 U.S. 261, 263-64, (2009) (per curiam) (quoting *United States v.*

*Spears*, 533 F.3d 715, 719 (2008) (Colloton, J., dissenting).

> **3.      The Factors Set Forth in 18 U.S.C. § 3553 as Applied in this Case Call for a
>          Below Guidelines Sentence**

      Section 3553(a) allows a sentencing court to consider a defendant in all of his or

her unique humanity.  As Judge Rakoff so eloquently explained:

> [S]urely, if ever a man is to receive credit for the good he has done,
> and his immediate misconduct assessed in the context of his
> overall life hitherto, it should be at the moment of his sentencing,
> when his very future hangs in the balance.  This elementary
> principle of weighing the good with the bad, which is basic to all
> the great religions, moral philosophies, and systems of justice, was
> plainly part of what Congress had in mind when it directed courts
> to consider, as a necessary sentencing factor, "the history and
> characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006); *accord Gall v. United*

*States*, 552 U.S. 38, 52 (2007) ("'It has been uniform and constant in the federal judicial tradition

for the sentencing judge to consider every convicted person as an individual and every case as a

unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and

punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))); *see also* 18

U.S.C. § 3661; U.S.S.G. § 1B1.4 (sentencing court not limited with respect to the information

concerning a defendant's background, character and conduct that it may consider for the purpose

of imposing an appropriate sentence).

      We respectfully submit that, after considering the Guidelines, this Court should

impose, in its discretion, the mandatory minimum sentence.  After weighing all those factors

- 23 -

delineated in 18 U.S.C. § 3553(a), which, in this post *Booker* regime, "acquire[] renewed significance," *United States v. Crosby*, 397 F.3d 103, 111 (2d Cir. 2005), we respectfully submit that any period of incarceration beyond 10 years would be inimical to the ends of justice. The fact is, because "'the punishment should fit the offender and not merely the crime'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011), and given the unique circumstances attending this particular defendant, we believe that the Court should grant a variance from what the guidelines otherwise prescribe.

> Unlike in the prior, mandatory regime:
>
> The statute, as modified by *Booker*, contains an overarching provision instructing district courts to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing, including "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant."

*Kimbrough v. United States*, 552 U.S. 85 (2007) (quoting 18 U.S.C. § 3553(a)); *see also* 18 U.S.C. § 3661.


## VI.   INDIVIDUALIZED ASSESSMENT OF EVAN ZAUDER

The Supreme Court recently confirmed that under *United States v. Booker*, 543 U.S. 220, 244 (2005), the Sentencing Guidelines are advisory. *Peugh*, ---U.S.---, 133 S. Ct. at 2080. *Booker* and subsequent decisions have resulted in a system that only "requires a court to give respectful *consideration* to the Guidelines," but it "*permits the court to tailor the sentence in light of other statutory concerns* as well." *Peugh*, ---U.S.---, 131 S. Ct. at 2072 (emphasis added).

When tailoring the appropriate sentence for a defendant, a sentencing court must "make an *individualized* assessment based on the facts presented," which includes "a broad command to consider 'the nature and circumstances of the offense and the history and characteristics of the defendant.'" *Gall v. United States*, 552 U.S. 38, 50 & n.6, 128 S. Ct. 586, 596 n.6, 597 (2007) (emphasis added); *see* 18 U.S.C § 3553.  In this case, both the circumstances of the offense and the history and characteristics of this defendant urge a sentence well below the Guideline sentencing range.  Indeed, if not for the mandatory minimum sentence required by law, we believe the Court would be well within its discretion to impose a sentence well below the mandatory minimum.

## A.      The Nature and Circumstances of Evan Zauder's Offense Conduct

Because the Presentence Report discusses the nature of the offense in great detail, including highly embarrassing conduct, we do not believe it is necessary to repeat, in similar detail, the entirety of the conduct at issue in our publicly filed memorandum to the Court.   In substance, Mr. Zauder has accepted responsibility for possessing and trading a significant amount of pornography focused on images of individuals in their teens.  In addition, he has accepted responsibility for enticing a teenaged person in New Jersey to engage in sexual activity.

Evan Zauder has committed serious crimes.  His problematic usage of the pornography focused on teenaged individuals and cyber-sexual behavior is at the core of his conduct.  Evan accepts the fact that his decision to engage in sexual contact with a teenaged person separates him from many other child pornography offenders.  However, we maintain that despite the serious nature and circumstances that surround these offenses, the totality of

circumstances lead to the conclusion that a sentence of 10 years imprisonment is more than sufficient to meet the ends of justice.

**B.**     <u>Evan Zauder's Extraordinary Personal History and Characteristics</u>

In making an "individualized assessment" at sentencing, *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008), the sentencing court is tasked with seeing each defendant in his or her unique human complexity and, in light of a defendant's particular life story, determining the appropriate sentence for the crime a defendant has committed. As this Sentencing Memorandum and the letters submitted in support of Evan Zauder demonstrate, he is much more than this criminal conduct: he is a person who has devoted his entire adult life to helping, educating, and improving the lives of others, while also suffering extensively as a result of the tragic personal events in his family life.

      **1.**     **Brief Personal Background**

Evan Zauder was born in New York, but was raised primarily in Toronto, Canada. He had a good upbringing in a tight-knit, modern Orthodox Jewish community. Evan was the youngest of three children born to Keith and Judy Zauder.

Evan's older sister, Lauren, has two children, Philip, 9, and Annie, 6. Lauren's marriage ended in divorce as a result of her husband's abandonment of the family in 2008. Evan stepped in not just as an uncle, but also as a part-time parent. He flew from New York to Toronto often in order to spend as much time as possible and provide them with a strong and stable male role model. He also called the children to speak with them nearly every day and attended significant school events.

Evan's older brother, Michael, suffered from birth with a very serious genetic disease, Familial Dysautonomia, which gave him a very short life expectancy that he somehow overcame and lived into his late 20's.   Evan and Michael had a very close and loving relationship.   Although younger, Evan assumed the role of older brother and mentor.   He frequently hosted Michael in New York, acting as a personal tour guide to his legally blind brother.

In the Spring of 2010, Evan, Michael and the rest of the Zauder family planned to spend Passover in Israel with a short stop-over in Amsterdam.   On the flight from Toronto to Amsterdam Michael suffered a pulmonary embolism.   As his condition worsened at the hotel in Amsterdam, he was rushed to the Intensive Care Unit of a Dutch hospital.   For several days, while Michael survived on life support, Evan refused to leave his older brother's side.   Evan witnessed his parents' torment during this time as they were forced to make the decision, over Evan's objection, to remove Michael from life support.   The days and months following his brother's death were especially devastating.   Evan reflected in his personal journal:



(Ex. 54, Journal of Evan Zauder, May 17, 2011 entry[8])

---

[8] Evan's brother passed away in March, 2010.  The first several entries in his journal are from the weeks immediately following his brother's death.   On May 17, 2011, Evan resumed his writing with a final entry due to ongoing depression surrounding his brother's death.   There are no missing entries between April 2010 and May 17, 2011.

It is clear from this and other entries in his journal, even to the non-medical, lay person, that Evan was suffering from profound grief and depression in the wake of his brother's passing.

**2.      Academic, Professional and Extra-Curricular Achievements**

Evan Zauder was an excellent student and received notable accolades throughout his early education.  He attended Yeshiva University and studied abroad at Yeshivat Hakotel in Jerusalem, Israel.  At the time of his arrest, Evan was a few credits shy of dual Masters Degrees in Education and Hebrew studies from New York University as a result of his inclusion in a highly selective fellowship program.   He had also completed the necessary coursework for Rabbinic Ordination.

While pursuing his many degrees, Evan was a hard-working professional in the field of secular and religious education.    Evan was an advisor to youth in the National Conference of Synagogue Youth, a division leader at Camp Stone, was selected to be a teacher and program director, highly coveted positions, at Yeshivat Noam, a prestigious middle school in New Jersey, and traveled to Kansas City once a month as part of his Rabbinic studies to deliver sermons, teach classes, and implement children's programming.

Evan's long list of academic and professional achievements is only surpassed by his dedication to volunteer work and community service.   He volunteered for local political campaigns, built homes for those affected by Hurricane Katrina through Habitat for Humanity, and spent school vacation weeks at soup kitchens feeding those in need.

While his academic and professional accolades are nothing short of astounding for someone so young, the motif of Evan Zauder's 27 years of life is a tireless dedication to helping others.  Despite the glowing recommendations we enclosed from so many in the field of

education, it is a certainty that Evan Zauder will never be a teacher again.   Though it is clear that Evan is to blame for throwing away much of this life that he worked so hard to achieve, his lifetime of efforts at doing good serve as evidence of the type of person Evan can be if given the chance at meaningful life after incarceration.

3.     **Evan's Accomplishments as a Student and Teacher Speak to his Ability to Learn and Contribute to Society**

Very early in his life, Evan [Zauder] "had decided on a life of service to others, and he dedicated himself to learning how he could best achieve this."  (Ex. 27, Letter of Gary Levine)  Evan was always an excellent student and acted as a consummate professional in his job as a teacher.  Indeed, it is Evan's extra-curricular devotion to helping others that defines his character and sets him apart from the vast majority of other criminal defendants who plead for leniency at sentencing.

Evan's career as a student and teacher speaks to his ability to learn, and, in this context, rehabilitate himself and positively re-enter society.  Moreover, Evan's family experience – a part of his education – has made Evan the kind of person who will never give up.  (Ex. 32, Letter of Deslie and Menachem Paneth, at 3:  "[Evan] is a mover and a shaker and doesn't give up, something that he was forced to learn throughout the difficulties in his life.")  Evan was always beyond his years in terms of "leadership" and "sensitivity."  (Ex. 43, Letter of Rabbi Baruch Taub, at 1)  "Evan Zauder is a young man who demonstrates the qualities that we, as educators, would like to nurture in all of our students: maturity, fortitude, sensitivity, responsibility, leadership."  (Ex. 41, Letter of Richard Stoll, at 1)

A friend writes:

Even more than his love of learning is Evan's love for teaching.  As a teacher myself in a Jewish Day School, I wish I could be so lucky as to have Evan for a colleague at my school.  Evan has perfected the talent of a

first class orator who understands how to select and summarize material so students of all ages and abilities can both understand and want to be even more engaged.  Whether it be an audience of ten or ten thousand, I have witnessed his students constantly enthralled by his material and delivery.

(Ex. 18, Letter of Keren Green at 1)

A friend and former colleague shares:

Evan is a natural leader and master educator, and he demonstrates these leadership qualities in every situation in which he finds himself.  He takes charge, but does not forget those around him.  He lifts up everyone he works with and makes them better for it.  Evan has excelled in his jobs at camp, in synagogues, and as a teacher, and he is beloved by all those who had the opportunity to learn from him and work with him.

(Ex. 10, Letter of Michael Emerson, at 3)

It is that ability and strength that will allow Evan to come out of this difficult situation with the ability to help himself and others.

Evan's academic career flourished from an early age and continued throughout higher education.  In college, Evan was accepted for a highly competitive fellowship called QUEST (Quality Education Skills Training) that took top students and sent them into schools to help at risk youth with a variety of issues ranging from drugs to body image.  "Evan was an eager learner.  Before going anywhere near a classroom or students, the QUEST fellows attended, prepared, and executed programming.  Fellows needed to be self-starters, motivated, and talented.  Evan was all of that and more."  (Ex. 3, Letter of Moshe Bellows, at 2)  Evan was an "excellent student" and graduated from college Magna Cum Laude.  (Ex. 42, Letter of Dean Rabbi Reuven Taragin, at 1)  To his parents' and community's delight, Evan was awarded a Fellowship to attend NYU to pursue two distinct Masters degrees concurrently, one in Hebrew and Judaic Studies, and one in Education.  (Ex. 52, Letter of Judy & Keith Zauder at 2: "Evan was a star on the rise.")  At the time of his arrest, Evan had successfully completed all of his

coursework for Rabbinic ordination.    All that he had left to complete was the last of four comprehensive exams.

Evan also distinguished himself in extracurricular activities.  His chosen activities ranged from philanthropic undertakings to serving as his school's class president senior year.  He also started up his school's charity club.  A friend writes:

> Evan's dedication to both his studies and his friends motivated me to immerse myself in the student body.  His enthusiasm and love for his school was both inspiring and infectious.  I most associate Evan with starting up the school's *tzedaka* or charity club.  Evan conjured so much excitement that students truly wanted to give to others as Evan gave to the student body.  Raising money for various causes, Evan extended himself to other clubs such as the school play, the tech committee and religious affairs.   It amazes me that Evan solidly maintained his position on the school's honour roll year after year while volunteering his time so willingly.

(Ex. 18, Letter of Keren Green, at 1)

Evan's commitment to areas of school life outside of the classroom was so profound that he often interacted directly with the school's principal, Gary Levine. Mr. Levine writes, "he [Evan] was certainly among the core of the most active, most positive students… He was on many committees, in fact: every committee… Evan's involvement was so extraordinary that we had to design a new award for him: The 100 Point Award, of which Evan was the first-ever recipient." (Ex. 27, Letter of Gary Levine at 1).

No matter how busy Evan was with school, his work and his substantial responsibilities at home, Evan always found time to listen and help others.  "[Evan] takes charge, but does not forget about those around him."  (Ex. 10, Letter of Michael Emerson, at 3)  A long-time classmate of Evan's writes:

> Every school has "that guy." The one who takes charge, the one who leads, the one who cares, the one who stands up for everyone else in the

group, the one who stays behind when someone is hurt… When a person
would have a problem in school, they would go to Evan.

(Ex. 8, Letter of David Eckstein, at 1)

Another fellow student writes:

It didn't take long for him to earn the nickname "Chief." To no one's
surprise, Evan became the president of the alumni organization, a post he
served out of the goodness of his own heart, and with little fanfare… He
contributed not because he wanted praise, but because he felt it was
important.

(Ex. 37, Letter of Yonatan Shefa, at 1)

Evan also flourished in his career as an educator. As the youth director at a New

Jersey synagogue, Evan was "beloved by all." (Ex. 47, Letter of Avi and Aviva Vogel, at 1) He

served, at all times, "with distinction." (Ex. 34, Letter of Rabbi Steven Pruzansky, at 1)  At no

time during his service did he ever cross any boundaries with students, nor was there ever a

single complaint lodged against him.  It is without question that Evan, despite being unable to

resume teaching because of his conviction, can contribute positively to the field of education

whether through research, writing or lecturing to other teachers, as he still has so much to offer

other educators.  (Ex. 1, Letter of Aliza Abrams, at 1: "Of every student I have ever worked with

I thought Evan had the greatest potential to become a successful educator.")

## 4.     Evan Used his Ability as an Educator and Natural Leader to Positively Influence his Community

Evan's kindness at home and in school translated into a young man with a strong

sense of his community.  It is telling that Evan signed all of his emails with the words "I will

change the world, just give me a little time." (Ex. 36, Letter of Ezra Schwartz, at 1)  Evan kept to

that message and would always reach out to people in need. A family friend writes, "within days

of finding out [that a family member had cancer] I received a most beautiful letter of comfort

addressed to both my wife and I… He wanted me to relate, in no uncertain terms, the love and care he has for . . . our family." (Ex. 16, Letter of Harry and Esther Goodman, at 1-2)

Evan would also protect kids in the neighborhood who had no one else to stand up for them.  Jordan Goodman writes:

> I'm sure Your Honor is aware how mean other kids could be when they see other kids who don't look or act like they do.  Never once did Evan ever make fun of me because of my expressive language difficulties.  Just the opposite, Evan was a source of constant encouragement to me.  He encouraged me to the point I was able to complete high school and recently encouraged me to try some courses at the college level.  It has helped me realize what I would like to do with my life.

(Ex. 17, Letter of Jordan Goodman, at 1)

Another friend writes, "I believe there are few individuals on this planet like Evan Zauder."  (Ex. 28, Letter of Max Lindenfeld, at 1)  Evan's kindness did not end at the walls of the school or the boundaries of the community; Rather, "[h]is activities during vacation time from school, to help the less fortunate, speak to the same gestalt." (Ex. 4, Letter of Rabbi Kenneth Brander, at 1)

Evan's neighbor further describes Evan's commitment to his community:

> He was a true leader, committed to serving the greater community (the committees in question were dedicated to charity and religious programming). He also volunteered on a number of occasions at the synagogue where Meir served as youth director, running booths at family events. He wanted to give back to the community in any way he could.

(Ex. 2, Letter of Meir and Ahuva Balofsky, at 1)

Finally, a head counselor that worked with Evan at a camp summarizes:

> Often, when people discuss criminal activity, they talk about the world being a better place with convicts "off the streets." In Evan's case, though, I would urge you to think about how much worse the world would be if he were never again given the opportunity to contribute. No matter where he is, Evan gives. I wasn't the least bit surprised to hear that, even in prison, Evan was teaching classes and organizing Jewish communal services. Like

I said, at bottom, Evan is a loving person, driven by a deep sense of altruism.

(Ex. 15, Letter of Malka Fleischman, at 2)

**5.**      **Evan has Immeasurable Regret and Remorse for his Conduct**

Evan's remorse, regret and profound sadness at the poor judgment he exhibited in not seeking help earlier is articulately expressed in his letter to Your Honor.  In pertinent part, Evan Zauder states:

> Every semester at YU I had to walk right past the counseling center to get cleared by my academic advisor to register for courses.  Every single semester I walked out of academic advising and literally faced the entryway to the counseling center.  I knew that I had a problem, and every time I stood there, I contemplated going in, but I was afraid of what might happen.  I was afraid of the shame, the embarrassment.  Would I lose my scholarship?  My job?  Would I be arrested?  What if I couldn't be fixed?  But that was selfish and it was profoundly stupid.  I never walked through that door.
>
> And now I'm sitting in federal prison, and I see the error of my ways.  I'm sorry for viewing and trading these images and videos, victimizing innocent people, teenagers who didn't even know that I was victimizing them by viewing their image.  I'm sorry for letting my problem escalate to the point that I would actually meet someone in person.  It is surely impossible to make amends for such a personal breach.  I apologize to my family, my friends, and my community.  For what it's worth, I apologize to my victims.  I regret my thoughts and my actions, and I resolve to never again succumb to such nefarious activity.
>
> By nature, most of my victims have no idea who I am, and those who do will surely have nothing to do with me.  But there are literally thousands of people who I've both embarrassed and disappointed.  I don't expect that I'll be able to repair those relationships, but I do intend to continue living the rest of my life as a testament to second chances.  People will be able to look at me and say, "he fell so hard, but he picked himself up, dusted himself off, and now he's a responsible, contributing member of our society again."

(Ex. 53  Letter of Evan Zauder, at 5)

The shame of Evan's conduct stays with Evan in all facets of his life. Each of the over fifty (50) letters represents a relationship in which Evan's crime had to be admitted. While the discussion and acknowledgment of one's own criminal conduct is always substantial, it is particularly important in this arena for two reasons. First, admitting guilt in a case involving these facts causes arguably more disgust and disenfranchisement from the community than other crimes. Second, because of the nature of Evan's problem, the ability to come to terms with his crime put him in an advantageous position in trying to conquer it.

Evan's own regret and remorse is beyond words. As Evan's great aunt writes:

> Evan has made a terrible mistake for which he is most remorseful. This mistake has already cost him very dearly; the completion of eight years of study and the prospective marriage to the love of his life. Evan's daily pain and regret go beyond our expectations and understanding.

(Ex. 5, Letter of Helene Braver, at 2)

Evan's aunt writes that "since June Evan and I have corresponded daily through emails… The remorse and regret that permeates the tone of his letters is palpable and painful." (Ex. 23, Letter of Judith and Daniel Israeli, at 1) Another friend shares, "Evan writes to me on a very regular basis, and I am overwhelmed by the strength of his words, his absolute admission regarding his conduct, and without a doubt, his sincere regret about his life situation." (Ex. 11, Letter of Renee Exton, at 2)

Doctor David Pelcovitz, a noted psychologist, summarizes Evan's current mindset best:

> In my interactions with Evan during and after class, what came through most, was his warmth, empathy, concern for others and genuine commitment to serve the community. In my meeting with him after his arrest he wasn't in the least bit defensive about his actions. He expressed sincere regret and remorse, wishing that he had the strength to get professional help for his problems before they reached the disastrous proportions that brought him to your courtroom.

- 35 -

> In over thirty years of practice, I have had the opportunity to treat many individuals with issues in the area of controlling their sexuality. As you know, the prognosis for sustained change is often guarded. In the case of Evan, however, I believe that he possesses many of the ingredients that I have come to associate with sustained change and potential to be a valuable member of society. A combination of an unusually supportive family coupled with Evan's advanced capacity for self-awareness and empathy should serve to improve the prognosis for becoming a valued member of his family and community.

(Ex. 33, Letter of David Pelcovitz, at 1-2)

### 6. The Tragedies that Befell Evan and the Zauder Family

Equal to the impressive accomplishments for such a young man is the extensive and deep tragic circumstances that Evan Zauder has endured throughout his life.

Evan's life from even an early age was tragically shadowed by the terrible disease that afflicted his brother. (Ex. 32, Letter of Deslie and Menachem Paneth, at 2: "Evan took on the role of big brother from the moment he was able to walk and talk."; *see also* Ex. 38, Letter of Jill S. Smulevitz, at 1: "[we] always marveled at the dedication, devotion, love, and compassion he gave to his brother, Michael."; Ex. 47, Letter of Avi and Aviva Vogel, at 1-2: "It struck me, though I was only a teenager, how proud he was to be Michael's brother and how responsibly and maturely he behaved.")

Dr. Michael Elman writes:

> From birth, Evan's life was shaped by his experiences with his older brother, Michael, of blessed memory, who struggled daily with life and death issues for all three decades of his life. Michael was born with familial dysautonomia, a recessive disease striking the autonomic nervous system. Evan, although younger, became a very active caregiver and companion to Michael. I personally witnessed the self-sacrifice and love Evan extended to his older brother.

(Ex. 9, Letter of Dr. Michael Elman, at 1)

Evan never left his brother's side. A family friend writes, "the entire neighborhood watched and learned the meaning of brotherly love. Evan is an inspiration and a role model." (Ex. 46, Letter of Shauna Tepperman, at 1)

Evan's parents were, for good reason, distracted by their insurmountable caretaking task and eventual grief. Evan had to grow up quicker than your typical youngest child. He was the "one we could all count on." (Ex. 39, Letter of Marc Smulevitz, at 1) However, as Evan took on a caretaking role with his brother, the realities of his brother's advancing condition aged them both. "Evan has been through more than any child should have to endure and these difficulties, although not noticeable on the surface, have impacted him beyond words." (Ex. 32, Letter of Deslie and Menachem Paneth, at 3)

Evan's quick transcendence from boy to venerated leader of his family is detailed throughout the letters. When Evan's brother suddenly passed away, it was Evan who dealt with the "logistics", including arrangements for the burial (Ex. 31, Letter of Luaren Nussbaum, at 2; *see also* Ex. 19, Letter of Charles Grysman, at 2: "He took a leadership role in arranging for his brother's burial and helping his parents and sister cope with the difficult situation; Ex. 32, Letter of Deslie and Menachem Paneth, at 2: "Everyone depended on Evan, like everyone always does.") Evan stood by his bedside, and spoke at his funeral. Evan quoted Deuteronomy "Place your heart into everything I told you today." (Ex. 50, Letter of Debra Wohl, at 1)

Evan's sister writes that "Evan's strength of character and maturity have definitely narrowed the age gap between us." (Ex. 31, Letter of Lauren Nussbaum, at 1) When Ms. Nussbaum's husband abandoned her and her children, Evan next stepped up and became their surrogate father. "Evan would make surprise visits to cheer them up, and shower the

children with love.  (Ex. 48, Letter of Rabbi Sam and Mrs. Lorraine Vogel)  Evan's parents, in

discussing the impact of Evan's absence on their daughter's children, write:

> Our Grandchildren are simply overwhelmed. Their father has left them,
> their Uncle Michael who was a daily presence has passed away, and now
> their very special Uncle Evan is missing from their lives.

(Ex. 52, Letter of Judith and Keith Zauder at 2)

That same maturity lead to Evan visiting and taking care of his grandparents and

anyone in need. (*See* Ex. 51, Letter of Helaine and Fred Zauder)   In regards to Evan and his

grandparents, family friends observe, "it was heartwarming to see the love and mutual [rapport]

between them." (Ex. 30, Letter of Edward and Terry Noy, at 1)   Evan even did things like "if

[Evan] had a day off from work or school he would drive out to New Jersey and fix things in our

home while we were at work." (Ex. 23, Letter of Judith and Daniel Israeli, at 1)

"Evan is wise beyond his years.  At fifty years old, we go to Evan for advice on

how to deal with our teenage children and have been asking his advice for many years."  (Ex. 32,

Letter of Deslie and Menachem Paneth at 2)  And it is these same series of traits that allowed

Evan to be so successful as a student, professional and community member.

Perhaps most importantly, his strong and loving family will help reintegrate Evan

into society when he is eventually released from his term of imprisonment. His sister ends her

letter as follows:

> I guess when all is said and done, the point I am trying to make is that my
> family and I need and value Evan so much. The world needs Evan. I have
> no doubt that he will inspire people to do good and he will rebuild his life
> over time. The many letters and thoughts from colleagues, clergy,
> professionals and loved ones cannot all be wrong. My hope and prayer is
> that he is able to move on from this experience as soon as legally possible
> so that he can make his mark on the world at large.

(Ex. 31, Letter of Lauren Nussbaum at 3)

## VII.   <u>CONCLUSION</u>

A non-Guidelines, mandatory minimum sentence of 10 years imprisonment is a severe sentence in this case, as to this defendant.  Though counsel is aware that the Court is bound by statute to impose a minimum of 10 years, a 10 year sentence is a very long sentence and, we respectfully note again, significantly longer than Evan would face had he been prosecuted by New Jersey state authorities for the same conduct.  Accordingly, we respectfully request the Court to sentence Evan Zauder to the mandatory minimum, a sentence that serves the purposes 18 U.S.C §3553 (a) and would be a sentence "sufficient, but not greater than necessary," to accomplish the traditional goals of sentencing.

Dated:    December 4, 2013
              New York, New York

                                              Respectfully,


                                              _/s/ Benjamin Brafman_____
                                              **Benjamin Brafman, Esq.**
                                              **Joshua D. Kirshner, Esq.**
                                              **Brafman & Associates, P.C.**
                                              ***Attorneys for Evan Zauder***
                                              **767 Third Avenue - 26th Floor**
                                              **New York, NY 10017**