DCI3ZAUC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          12 CR 659 (LAK)

5    EVAN ZAUDER,

6                   Defendant.

7    ------------------------------x

8                                          New York, N.Y.
                                           December 18, 2013
9                                          3:00 p.m.

10

11   Before:

12                   HON. LEWIS A. KAPLAN,

                                           District Judge
13

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     PAUL MONTELEONI
17        Assistant United States Attorney

18   BRAFMAN & ASSOCIATES
          Attorneys for Defendant
19   BENJAMIN BRAFMAN
     JOSHUA KIRSHNER
20

21

22

23

24

25
```

DCI3ZAUC

1          THE DEPUTY CLERK:  United States v. Evan Zauder.

2    Government, are you ready?

3          MR. MONTELEONI:  Yes.  Good afternoon, your Honor.

4    Paul Monteleoni for the government.

5          THE COURT:  Good afternoon.

6          MR. BRAFMAN:  Good afternoon, sir.  Benjamin Brafman

7    and Joshua Kirshner for the defendant.

8          THE COURT:  Mr. Brafman.  When I really began to

9    immerse myself in this material, for which I'm grateful, it

10   becomes very clear that this is not anything approaching an

11   easy sentence from any point of view.  So I sent word to you

12   both yesterday that I did not intend to sentence today, but it

13   would be helpful to hear argument.  And that probably was

14   viewed as not very helpful of me.

15         So let me tell you some of the things that are on my

16   mind.  One thing that's on my mind and that I hope we can

17   address first is to walk through the difference between the

18   probation department's guidelines computation and the

19   government's position, so that I can come to a final view as to

20   what the guidelines recommend before getting into the question

21   of whether and to what extent I ought to apply them.

22         Once we get through that subject, it seems to me it

23   would be useful to talk about what I ought to do in relation to

24   the guideline range, up, down, or sideways.

25         And the third thing I think would be helpful would be

DCI3ZAUC

1     to talk about what I really should make of the psychiatric

2     submissions, which, without meaning to demean anybody, seem

3     filled, to my eye, with an awful lot of jargon.

4               With that guidance, who wants to begin?

5               MR. MONTELEONI:  Your Honor, if I may be heard on the

6     guideline computation.  That might be the easiest starting

7     point.

8               THE COURT:  Yes.

9               MR. MONTELEONI:  So, the central issue driving the

10    dispute between the government and the United States probation

11    office with respect to the guideline computation is whether the

12    five-level upward enhancement under Section 2G2.2(b)(5) applies

13    to the child pornography counts.  And then following on that

14    there is also a dispute as to whether those two child

15    pornography counts group with count one, the child exploitation

16    count.

17              The probation office's view is that the five-level

18    upward adjustment for the child pornography counts does not

19    apply because it references conduct that is partially accounted

20    for in count one.  And it then believes that that conduct

21    should not be considered with respect to counts two and three,

22    because it believes that count one should not group with counts

23    two and three, because they involved different victims.

24              Now, initially, whether or not the counts group, there

25    is the question of whether the Court should decline to apply

DCI3ZAUC

the five-level upward adjustment because it has something to do

with a different count.  And that's simply not a basis for

declining to apply an otherwise applicable upward adjustment.

As we set forth in our brief, relevant conduct

includes a number of factors that are part of the same course

of conduct as the offense, but relevant conduct also includes,

to the extent not otherwise covered, any other information

specified in the applicable guideline.

So, the guideline for counts two and three calls for

an evaluation of whether the defendant in fact engaged in a

pattern of activity involving the sexual abuse or exploitation

of a minor.

Now, since the guidelines specifically says the Court

is to look to that, and the application note says it is to look

to whether or not this offense occurred during the course of

the commission of the child pornography offense, whether or not

there were convictions associated with that offense, and

whether or not these multiple incidents of abuse or

exploitation of a minor involved the same minor.

Since the guideline asks the Court to look at that

information, there is no basis for declining to apply that

upward adjustment where there no dispute as to the facts.

We believe that the five-level upward adjustment under Section

2G2.2(b)(5) is certainly part of the relevant conduct of the

child pornography counts, because the definition of "relevant

5

DCI3ZAUC

1    conduct" specifically says if the guideline asks for it, then

2    that's information that you have to consider.

3         Now, the government does disagree with the probation

4    office as to whether the two counts group.  But, if the Court

5    agrees with the government that the enhancement properly

6    applies to the child pornography count, grouping actually is

7    more favorable to the defendant than not grouping.  Because if

8    count one did not group with counts two and three, then the

9    defendant might face additional units and a range even higher

10   than that in the plea agreement.

11        The government, however, does not believe that that's

12   the right result.  And that's because the provision under which

13   count one groups with counts two and three does not require the

14   two counts to have had the same victim.  It says that "wherever

15   conduct involved in one count is a specific offense

16   characteristic with respect to the guidelines applicable to a

17   different count, then they group together."  That's to prevent

18   double counting.  That's a protection for defendants.

19        THE COURT:  This was 3D1.2(c); is that right?

20        MR. MONTELEONI:  Exactly.  And we believe that the

21   probation office applied the general principle that grouping

22   usually follows where offenses have the same victim, because

23   most of the other grouping provisions do have an explicit

24   provision for the same victim.  But Subsection (c) does not.

25   We think that is a meaningful distinction, and also harmonizes

DCI3ZAUC

1    with the facts that the enhancement for count one applies in

2    counts two and three.  So it would be double counting not to

3    group them.

4              THE COURT:  You say they don't group, and that the

5    guideline range comes out much higher than probation

6    recommends.  Specifically 262 to 327, corresponding to an

7    adjusted offense level of 39.

8              MR. MONTELEONI:  That is our position, yes.

9              THE COURT:  Okay.  So Mr. Brafman, what do you have to

10   say to that?

11             MR. BRAFMAN:  Your Honor, we worked hard with the

12   government prior to entering into the plea agreement to try and

13   calculate the appropriate guideline range.  And to be perfectly

14   candid, I think we did.  As much as I would like to say I think

15   we made a mistake and probation got it right, I think I'm bound

16   by the terms of the plea agreement, unless someone were able to

17   persuade me that we made an error that is clear.  And I've read

18   the citations and sections cited by probation, and while I

19   don't dispute that a reading of it that way can get them to

20   where they want to be, I can tell you that when we calculated

21   these guidelines, without their input, we both agreed on both

22   sides that the level unfortunately was 39.

23             THE COURT:  Well, I spent a fair amount of time

24   yesterday working through this myself.  And although I

25   understand where probation is coming from, I'm persuaded that

7

DCI3ZAUC

1    the government is right on this.  I think there is the

2    five-level bump up under 2G2.2(b)(5) with respect to count one.

3    And I think that under 3D1.2(c), that means everything is

4    grouped together and the range is 262 to 327.

5            Now, putting aside the technicality of the guideline

6    computation, we're using the word "group" in an entirely

7    non-technical sense, with one group of pornography counts,

8    namely two and three, and with this enticement sexual abuse

9    count, count one.

10           Or do I have it backwards?

11           MR. MONTELEONI:  That's correct.

12           MR. BRAFMAN:  That's correct.

13           THE COURT:  I have it right.  Okay.  Now, does

14   everybody agree that if we looked at count one standing alone,

15   the guideline range on count one is 32?

16           MR. BRAFMAN:  I agree with that, your Honor.

17           THE COURT:  The adjusted offense level.

18           MR. BRAFMAN:  Yes.

19           MR. MONTELEONI:  Your Honor, I don't have that

20   calculation in front of me.  If you want, I can review it.

21           THE COURT:  The presentence report does the

22   calculation.  I'm not sure you agree with it.  It starts at

23   page 14, and it starts with a base offense level of 28.  Under

24   2G1.3, there is a two-level bump up for the use of a computer

25   in the enticement, two-level bump up for sexual contact which

DCI3ZAUC

1  gets you to 32.  I guess you come back to 29.

2              MR. BRAFMAN:  After acceptance.

3              THE COURT:  Because of acceptance of responsibility.

4              MR. MONTELEONI:  I believe that that would be the

5  calculation if the defendant was only -- if only the count one

6  conduct was relevant conduct.

7              THE COURT:  That would be a range of 87 to 108 months.

8  Then if we look at counts two and three, and if we are looking

9  at those without regard to count one, certainly those two

10  counts would be grouped.  Right?

11              MR. MONTELEONI:  Yes, your Honor.

12              THE COURT:  If we look at that, we have the base

13  offense level of 22, plus two for prepubescent minors, plus two

14  for distribution, plus four for sadomasochistic stuff, plus two

15  for computer, and let's say for the sake of argument plus five

16  for the enticement.  I suppose it was not charged conduct.

17  That gets us to 37, minus three for acceptance.  We would be

18  looking at 34, which would be 151 to 188.

19              Anybody disagree with that?

20              MR. MONTELEONI:  Yes, your Honor.  I believe that the

21  Court declined to apply the five-level upward adjustment for

22  the number of images under (b)(7)(D).

23              THE COURT:  You're right.  That would get you to 39.

24  Thank you for that.  So 262 to 327.

25              I started looking at it this way a little bit

DCI3ZAUC

1  yesterday, and the question that I had, or certainly one

2  question that I had, was this:  If this were purely a

3  pornography case, taking it in the light most favorable to the

4  government, which I add simply to reflect the fact that I'm

5  including on a worst-case basis from the defendant's point of

6  view the five-point bump up in the pornography for enticement.

7  Don't we have a case that comes within Dorvee?

8          MR. BRAFMAN:  Judge, if I may.  I know we both

9  probably want to be heard.

10          THE COURT:  Sure.

11          MR. BRAFMAN:  I think it does.  And I want to begin by

12  first of all thanking the Court for this opportunity, because

13  this is one of the most difficult sentences I think I've

14  involved myself in in 37 years.  And the opportunity to first

15  address the issues before the Court signs off is I think a

16  worthwhile exercise, even though you're right, when I first got

17  the Court's order, I was disappointed because of the anxiety

18  that this increases.

19          THE COURT:  I'm very aware of that.

20          MR. BRAFMAN:  Yes.  But from the getting-it-right

21  perspective, this is a very intelligent way to proceed.

22          I think the government misreads when we cite Dorvee.

23  The government suggests that Dorvee is inapposite because

24  Dorvee did not involve sexual contact.  That's not what we cite

25  Dorvee for.  We cite it because Dorvee does two things.  One

DCI3ZAUC

1   perhaps as important as the other, but one that gets sort of

2   lost.

3           In the Dorvee decision there is an implicit suggestion

4   that we're sort of backing into a number that we feel

5   comfortable with, but nobody really knows what the right number

6   is.  We have a mandatory minimum, then you have a chance to go

7   up, can't go below.  And how far you go up is fact specific to

8   each case.  And Dorvee sort of intimates there is no real

9   guidance for the courts in large measure.

10          What Dorvee then does is give the Court some very

11  important guidance and give us all important guidance when they

12  suggest that what happens under 2G2.2 is that the guidelines

13  shoot up dramatically by virtue of the facts or aspects that

14  are inherent in the core crime itself.  To suggest that you get

15  a two-point bump for using a computer when you are using a

16  computer to commit the crime suggests to me double counting.

17  When you say you get a five-point bump because there are 600

18  images, once you start to file share it is almost impossible to

19  control what comes in to your computer.  So 600 images is not

20  dramatically high, and yet you get a five-point enhancement.

21          When you get a file share, assume you are interested,

22  as in this case, in only teen-age men, boys.  They are minors,

23  but you are not interested in children or very young children.

24  You are not interested in sadomasochistic behavior.

25          Whatever comes into your computer, once you're in this

DCI3ZAUC

1    horrible land, you're stuck with.  To the extent that in

2    addition to teen-age boys that you're interested in looking at,

3    something involving a very young child, involved in very

4    offensive behavior, if that comes in, you have it whether you

5    asked for it or not, and you are then saddled with another

6    substantial increase.

7          What ultimately happens, <u>Dorvee</u> explains, is that

8    without any real legitimate -- when I say "legitimate" --

9    without any real statistical reason that would normally apply

10   in a sentencing commission enhancement, you just get bumped by

11   these progressive enhancements that are essentially part of the

12   core crime itself.

13         That's why, in many of the cases that we cited to the

14   Court in our brief, the courts have imposed guideline sentences

15   substantially below.  And again, I point out something which I

16   think the government ignores.  In each case, it is not only

17   fact specific as to the nature of the crime and the nature of

18   the conduct, but it should also be fact specific as to who the

19   person is who is being sentenced.  What other redeeming

20   qualities they may have, other than the fact that they've

21   committed a fairly serious crime.  Are they responding well in

22   treatment.  Are they in treatment.  Have they demonstrated to

23   the Court through acceptance of responsibility that they are

24   getting better, that they do have the ability to recover and

25   one day be productive again.

DCI3ZAUC

        Then the question which you, sir, ultimately have to
decide, is how much prison is necessary.  For probation to say
we want 168 months, assuming their guidelines is in their own
mind correct.  And whether it is correct or not, they certainly
had the discretion, even at their level, to say we think the
higher end of the guidelines is the sentence we recommend.

        So even if we conclude that their guideline analysis
is wrong, what is right is their view that the minimum -- the
low end of even that guideline is sufficient.  Meaning the
independent probation officer has concluded that, given all of
the facts that are specific to this defendant, that in their
view 168 months, which is 14 years, is sufficient.  Which is
substantially closer, obviously, to the 10-year mandatory
minimum that we are requesting.

        Also, I think important is the government's
acknowledgment that a guideline sentence is not what they are
asking for.  Implicit in that argument, even though they don't
say it anywhere, is they recognize that a guideline sentence
would be a draconian sentence.

        When the government concedes that, what they say,
however, is a sentence substantially beyond the mandatory
minimum would be appropriate and they give a variety of
reasons.  I suggest, most respectfully, and I'm happy to
discuss this further, is that when you say that, you're
essentially telling the judge we don't know what the sentence

DCI3ZAUC

1    should be.  We're leaving it to you, sir, to decide what the

2    sentence should be.  All they're saying is it should be more

3    than 10.  What does "substantially more" mean?  Does it mean

4    11, does it mean 16?

5            THE COURT:  It depends whether you're asking for it or

6    doing the time.

7            MR. BRAFMAN:  I'm sorry?

8            THE COURT:  It depends whether you're asking for it or

9    doing the time.

10           MR. BRAFMAN:  Correct, sir.  When you are doing the

11   time.  One of the sad parts of this case, as I've dreaded this

12   day only because of the gravity of the circumstances, not any

13   other reason, as I dreaded this day, I've come to the

14   realization that even if everything works out perfectly, and

15   even if you accept every one of our arguments and agree with me

16   conclusively, I'm still watching a young man who I think has

17   many, very important redeeming qualities, getting a sentence of

18   10 years in prison.  That is a very long time.

19           And I think when you look at the cases cited by the

20   government, with respect to sentences that were imposed that

21   are substantially beyond the minimum, many of them involved a

22   serious abuse of trust, many of them involved people with

23   criminal records, many of them involved conduct far more

24   offensive than this case.  And yes, some of them don't involve

25   contact.

DCI3ZAUC

1    When we took the plea here, one of the things your

2    Honor asked us to do -- and I am digressing.  If you want me to

3    stop, tell me.  One of the things your Honor asked us to do is

4    give you some indication of where other judges in this district

5    come out in these cases, and then also what sentence the

6    defendant would face if he had been prosecuted for statutory

7    rape under New Jersey state law, which is essentially the crime

8    of conviction.

9    What is startling to me in this case, and I still

10   can't reconcile it, is that although the count one, the

11   enticement count, is the more serious of the statute because

12   that has the mandatory minimum of 10 years, it is not the

13   statute or the crime that fuels the guidelines.  To me that's a

14   terrible irony, which normally doesn't happen.  It is normally

15   the most serious crime is what you end up getting substantially

16   punished for.

17   THE COURT:  There are those who would argue, and maybe

18   justifiably argue, that it is really the pornography count

19   that's the more serious, because the pornography count involves

20   a very large number of child victims, although there isn't the

21   same personal affront by the defendant to an identifiable

22   victim on the pornography counts.

23   MR. BRAFMAN:  I hear that argument.  I understand it.

24   But by the same token, the Congress did not impose on you a

25   mandatory minimum that precludes you from giving a sentence

DCI3ZAUC

1    below 10 years, even though if you thought 10 years was

2    appropriate.  I hear the argument.

3           What they rely on instead, and what Dorvee suggests is

4    just bad law, what they rely on instead is we give you a

5    mandatory minimum five years, then we build the crime up to

6    life in prison.  One of the things Dorvee points out, if you

7    are dealing with a first offender or a serial pornographer,

8    they could both be facing the same sentence.  When you're

9    getting into 20, 30 year range in the life of a productive

10   person, you are essentially dealing with a life sentence as a

11   practical matter.

12          And Judge, the thing that I think is missing from the

13   argument -- not from the argument with the Court, but from the

14   argument with the government -- is I commend them for not

15   asking for a guideline sentence.  But they have essentially

16   otherwise ignored the fact that this is a young man who had

17   extraordinary promise, extraordinary educational achievements

18   by a very young age, had no incident whatsoever in any job, and

19   even though his jobs involved teaching and supervising

20   thousands of young men over five or six years, not one

21   complaint, not one letter, not one instance of impropriety.  So

22   he could obviously separate his illness, if you will, yet keep

23   it cubby holed from his work, which is hard to do.

24          THE COURT:  What does Dorvee say about the extent of

25   the deference due to the child pornography guidelines as

DCI3ZAUC

1    opposed to others?

2           MR. BRAFMAN:  I think what Dorvee says is you can't

3    lose sight of 3553.  And I think they defer it to the Court.

4    And Dorvee, I actually tried a case before Judge McEvoy up in

5    the Northern District who was I think the District Court in the

6    Dorvee case.  He's a very, very good judge, and I think a very,

7    very fair judge.  I have great respect for him.

8           What Judge McEvoy did, which brought Dorvee up to the

9    Second Circuit, was in the way he imposed sentence he didn't

10   come to a definitive sentencing guideline that he said actually

11   applied.  And as a consequence, when he imposed the sentence he

12   did, suggesting that it was well below the guideline, it was an

13   artificial guideline that was wrong.  So they sent it back

14   essentially to be resentenced.

15          It is where we end up that we're concerned with, not

16   where we start.

17          However, if a District Court says I'm starting at X,

18   and I think because of certain reasons I'm going to vary down

19   from X.  If X is not the correct guideline and if the judge

20   misspoke, you need to go back and say the starting point was

21   really lower, Judge.  Because what happened in Dorvee, the

22   judge varied from a higher guideline than the correct

23   guideline.  And if you went back and you did that same math

24   over again, I think the defendant there would have earned

25   several years, quite frankly, if the correct guideline had been

DCI3ZAUC

1  the Court's starting point.  Now, I think it was a misspeak by

2  the Court.  I think clearly that's what seems to have happened.

3       When I read Dorvee, and when I finished reading

4  Dorvee, Dorvee says to me when a Court sentences in a child

5  pornography case, you cannot and should not just apply the

6  enhancements in 2G2.2 because, although we're not striking down

7  that statute, it is clear to us that there is double counting.

8  There is sort of artificial enhancements that make it higher

9  and higher and higher and higher.  It is the only way I think I

10 can read Dorvee.  I don't think it is binding on the Court so

11 that you cannot apply any of the enhancements on 2G2, but when

12 we just focus, for example, on the use of a computer, inherent

13 in the crime of conviction, you can't do this without file

14 sharing on a computer.

15      So, at the end of the day, Judge, you have very, very

16 wide discretion, I submit, and I say this with great respect

17 for the independence of this.  You have great discretion.  I

18 think you can start from wherever you deem appropriate in terms

19 of what the guidelines are, but recognize, as in Dorvee, that

20 the guidelines starts at a number where they shouldn't start if

21 we were doing this in the way the sentencing commission was

22 supposed to charter this area.  As a result, where you start is

23 so artificially high, that you should end up somewhere

24 substantially lower.  How low is really up to the Court.

25      And when the government is not asking for a guideline

DCI3ZAUC

1    sentence, to their credit, I think recognizing that to do so in

2    this case, in this district, would be to fly in the face of

3    Dorvee.  I think we then start to do fact-specific inquiries

4    with respect to this case and also this defendant.

5        What I think the government has done in its

6    recommendation is focus exclusively on the facts of the case,

7    and ignored completely the individual who the Court is going to

8    have to sentence.

9        I'm prepared to continue because I have other things I

10   would like to say, but I'll be guided by the Court.

11       THE COURT:  Okay.  Let me hear from Mr. Monteleoni on

12   the question that I put to Mr. Brafman a few minutes ago.

13       MR. MONTELEONI:  Thank you, your Honor.

14       First, I have one or two factual caveats to make to

15   some of the points that Mr. Brafman made with respect to the

16   appropriateness of the quantity enhancement.  He described file

17   sharing where a defendant is just stuck with certain images of

18   child pornography.  In this case, though, there is some

19   evidence that file sharing was used because there was a folder

20   that was called LimeWire.  There is also evidence of direct

21   Skype file transfers, which I believe have to be personally

22   initiated for some volumes of files, certainly not all of the

23   hundreds of them.

24       But I don't think that this is just a case where

25   someone attempts to consume child pornography, does so through

DCI3ZAUC

1   file sharing, and ends up with an anomalously large quantity of

2   child pornography.

3           I think that there is a lot to be said about that case

4   as well, and I'd like to do so.  The government agrees that a

5   sentence lower than the guidelines range in this case could be

6   sufficient to achieve the purposes of punishment and therefore

7   should be imposed if the Court agrees with the government.  So,

8   in that sense, I think we are already in the range of outcomes

9   that the Second Circuit's remand in <u>Dorvee</u> would have produced,

10  a below-guideline sentence.  The government does believe that's

11  appropriate.

12          We don't, however, come to this position just

13  mechanically, just by considering the nature of the offenses,

14  and we don't think the fact that a below-guideline sentence is

15  appropriate in this case means that you just throw out the

16  guidelines and don't let it inform anything.  Here's why I

17  think the guidelines are owed a measure of greater deference

18  than that.

19          THE COURT:  Greater than throwing them out.

20          MR. MONTELEONI:  Yes.  The courts have found that

21  <u>Dorvee</u> doesn't apply where the guidelines fall within the

22  combined statutory maxima of all counts run together, and there

23  is a good reason for that which flows from the logic of <u>Dorvee</u>.

24  Part of the reason that the sentence in that case was

25  unreasonable is that the guidelines provided no guidance,

DCI3ZAUC

1    because a guideline sentence would always be simply the top of

2    the statutory range.  Not even a range, a single number.  And

3    that would be the case, according to the panel in Dorvee, in

4    both the extremely egregious cases and in the less egregious

5    cases.  So the guidelines weren't really guiding.

6          In cases like Aumais, however, where the guidelines

7    range is well below the top of the combined statutory maximums,

8    there is room for movement in the range to convey useful

9    information to the judge because that will change the window of

10   sentence that the Court can permissibly impose.

11         So first of all, we think that their failure to be

12   able to signal to the Court is just a factor that doesn't

13   apply, and the Aumais case so held.

14         Additionally, Dorvee was a case not involving actual

15   sexual contact with minors, and the government believes that is

16   an extraordinarily important distinction.

17         THE COURT:  Sure.  Sure.  But, doesn't Dorvee either

18   say or intimate that the child pornography guidelines have been

19   essentially dictated by Congress, have no or little benefit of

20   considered reflection by the sentencing commission, not much in

21   the way of empirical support.  Doesn't it also say that?

22         MR. MONTELEONI:  Your Honor, it does suggest a

23   preference for the type of empirical data that went in, to an

24   extent, to certain other guidelines.

25         However, if you look at drug guidelines, white collar

DCI3ZAUC

guidelines, and pornography guidelines, actually all of them

reflect changes that were made in response to changes by

Congress, not just an attempt to quantify and average out what

courts had been doing previously.

In fact, I would say it is really the exception in the

most commonly used guidelines for the guidelines to simply just

be a summary of what courts were doing before.  The sentencing

commission has been imposing policy choices, not just in this

guideline, but in a number of different guidelines.  And though

that does limit the empirical foundations of the guideline --

THE COURT:  You mean the Congress, not the sentencing

commission, right?

MR. MONTELEONI:  Well, it is a complex interplay of

both, actually.  In the case of the drug guidelines, the

sentencing commission made the decision to raise the guidelines

so that they didn't create any cliffs with the mandatory

minimums that Congress set.  So the commission took its cues

from Congress.

More fundamentally, though, I think that both the

commission and Congress are rightly authorized to change, not

just reflect, what norms and practices are.  White collar

guidelines have been increased because of a perception by

policy makers that actually, individuals who were engaged in

serious crimes would receive insufficient punishment.  I think

that sexual offenses have undergone something of a change in

DCI3ZAUC

1   norms over time as well.

2          THE COURT:  Am I mistaken in understanding <u>Dorvee</u> as

3   suggesting that the child pornography guidelines are different

4   from most others?

5          MR. MONTELEONI:  Yes.  That's not a mistake.  The

6   Second Circuit in <u>Dorvee</u> says that the Section 2G2.2 has an

7   unusual provenance, and unless it is applied with great care,

8   it can result in unreasonable sentences.  And the government

9   agrees that this Court should apply it with care.

10          THE COURT:  Would it be an unreasonable way in which

11   to view this as to say, look, we've basically got two somewhat

12   different things here.  We have the sexual abuse slash

13   enticement count where there is physical contact, the whole

14   package of the elements there.  And on that we are at a level

15   29.  With respect to the pornography counts, we are at a level

16   39, even giving the government the benefit of the bump up for

17   the sexual contact, which you wouldn't have if you were truly

18   considering the pornography all by itself.

19          Therefore, in light of <u>Dorvee</u>, maybe I shouldn't give

20   as much weight to what the range would be if we had simply a

21   pornography case of the type that we have here, as I give to

22   the guidelines on what the enticement case would be if it stood

23   alone.

24          MR. MONTELEONI:  Well, so, I think that there are

25   aspects of what you say that the government agrees with.  We

DCI3ZAUC

think that Section 2G2.2, the guideline that is driving this
outcome, is something that the Second Circuit has said the
Court should take great care in applying and not simply do so
mechanically, and we don't believe that you should do so
mechanically, certainly.

One point about if this had been a child pornography
case without a conviction on count one, if it had just been the
conduct, if it had just been the uncharged conduct with contact
with minors constituting the sexual abuse, the level of 39 on
just the child pornography counts would be exactly the same as
the level 39 that he's facing right now.  The offense level set
forth in the plea agreement is a total of 39, and that's
because they all grouped together, and the contact with
children is taken into account in the form of that five-level
adjustment.

THE COURT:  Right.  If you had a pure pornography
case, an identical pure pornography case, without the contact,
you would be at a level 34.

MR. MONTELEONI:  Yes.  That is correct.  And it
certainly is correct that the guidelines range in this case is
driven in part by a number of enhancements that relate to the
child pornography conduct that the Second Circuit has said
should be viewed with great caution.  That's completely true.

I do think, though, that there are reasons not to see
these two things as completely isolated, and I think they bear

24

DCI3ZAUC

1    serious consideration.

2           First of all, the contact with minors actually -- it

3    did happen using some of the same mechanisms that the child

4    pornography offenses happened.  He was using Skype and he was

5    using it --

6           THE COURT:  He was using a computer.  Fair enough.

7    Understood.  Computer, Internet, whatever.  That's the way it's

8    done nowadays.

9           MR. MONTELEONI:  Well, that may be.  But it may be

10   that what's done nowadays is particularly harmful compared to

11   what was done back then.

12          THE COURT:  Look at it from this point of view and

13   then tell me whether you think I'm wrong in looking at it.

14          You've got count one on which, standing alone, you

15   would have a guideline range of 87 to 108, except it slides up

16   to 120 because of the mandatory minimum.  So, the defendant on

17   the count one offense is paying a pretty stiff price through

18   the means of the mandatory minimum for the contact, as compared

19   to a comparable guidelines sentence in another case with the

20   identical offense level, right?  Sexual contact, Congress says,

21   is very bad.  They are entitled to say that; no question about

22   it.  And they say whereas somebody who committed a robbery and

23   comes out at offense level 34 gets 87 to 108.  Because this is

24   not a robbery, it is sexual contact, mandatory minimum of 120.

25   So there a special price being paid for the sexual contact.

DCI3ZAUC

1          Then you flip over and you look at the pornography

2     count and you say, well, the pornography is much worse because

3     there has been a sexual contact for which a price is already

4     being paid on count one in the form of the increase in the

5     guideline range by virtue of the mandatory minimum as compared

6     to an identically situated, in terms of offense level,

7     offender.

8          You see where I'm coming from?

9          MR. MONTELEONI:  I do.  I believe I do. I think that

10    your point is that --

11         THE COURT:  It is a form of double counting.

12         MR. MONTELEONI:  Well, that could be.  It could be

13    seen in that way.  I think the way the government would prefer

14    the Court to look at it is that actually the range of relevant

15    conduct in this case is actually far greater than the range of

16    charged conduct as set forth in the PSR.  Not disputed.  There

17    are a number of other contacts.  Those contacts form the

18    pattern.  Actually if there had just been the count one offense

19    but no other contacts, he wouldn't have even qualified for the

20    five-level upward adjustment, because the five-level upward

21    adjustment requires a pattern.  More than one action.

22         THE COURT:  I think that's a fair point.  I take that

23    point.

24         MR. MONTELEONI:  The totality of uncharged but

25    extraordinarily relevant conduct is accounted for in a way by

DCI3ZAUC

1   the guidelines range, and we accept that the guidelines range

2   is the starting point but not the ending point for what the

3   sentence should be.

4           But I think that it also makes sense to consider them

5   together because of the repetitive and pervasive nature of both

6   the pornography offenses, it appears, and the contact offenses.

7   It seems that he was using sort of similar means and mechanism

8   of semi-anonymous contact with strangers related to sexual

9   gratification from children.  And in some cases that involved

10  actual contact directly with the minors, either virtually

11  through these webcam sessions or in person through at least one

12  physical in-person encounter, or his participation was somewhat

13  more attenuated participation by creating an incremental amount

14  of demand for these images, though I think that the images

15  themselves often depict extraordinarily -- extraordinarily

16  terrible abuse.

17          And so, it is true that the defendant's responsibility

18  for that is more diffuse than if he had been there personally.

19  What he is connected with is a broader universe of, as the

20  Court says, more victims.

21          We would also add that sadomasochistic enhancement and

22  similar adjustments suggest an extraordinarily depraved level

23  of abuse by the producers.

24          THE COURT:  That would all be accounted for if we look

25  at the pornography offense level, assuming it would be

DCI3ZAUC

1   considered separately, which I understand it's not, as being a

2   34, because you've got everything into that except for the

3   contact.

4          MR. MONTELEONI:  Well, yes, your Honor.  I think that

5   the decision of the commission and Congress that these offenses

6   are similar is made in part on the basis of a belief that the

7   one may lead into the other.  And I think if you look at the

8   facts in this case, that's certainly borne out.  It is

9   certainly consistent with what happened here, that a growing

10  incremental exposure to this illicit practice of getting sexual

11  gratification from children being sexual, that it went first

12  from the simple consumption and I assume distribution right at

13  the beginning of pornography.  Perhaps the distribution came a

14  little later.  We don't know all of the facts.  And then over

15  time, he moved on to actual contact offenses.  I think that

16  pattern is totally consistent with the view that these are

17  actually related.

18          THE COURT:  Well, consistent with.  But lots of

19  sneezing is consistent with very minor things and very grave

20  illnesses.

21          MR. MONTELEONI:  That's true.  The standard here is --

22          THE COURT:  I'm not making light of what you say, not

23  at all.  But "consistent with" is not a phrase that gets me

24  very far.

25          Let me just pass on to this.  You're asking for a

DCI3ZAUC

1   sentence substantially more than the mandatory minimum.  You

2   are entitled to the mandatory minimum.  I have no choice about

3   the mandatory minimum.  I am trying to get my arms around

4   where, if anywhere, but the mandatory minimum I ought to go.

5          So, this is obvious from my discussion with you both,

6   that I'm thinking about approaching that -- without having

7   formed a conclusion -- by saying if you look at these two

8   offenses, each standing alone, and the pornography offense,

9   because we're looking at it standing alone, doesn't have the

10   five-level enticement enhancement.  We are looking at count

11   one, which is 87 to 108.  We are looking at counts two and

12   three, which is 161 to 188.

13          So, subject to one very important qualification, I

14   should maybe really be looking at this as if the guideline

15   range were 87 to 188, and then factoring into this (A) the

16   mandatory minimum; and (B) that whatever enhancement I apply in

17   my own mind, by virtue of the inner relationship between the

18   contact and the pornography, and by virtue of the fact that

19   some of the contact is uncharged, but acknowledged, maybe what

20   I do is, in thinking about where within that 87 to 188 range I

21   go, or if I should go beyond the far end of it, I should think

22   about those two other factors:  The mandatory minimum and the

23   pattern of contact.

24          Just in terms of concept, not in terms of numbers,

25   what is your reaction?

DCI3ZAUC

1          MR. MONTELEONI:  I think that if the Court were to

2     carry that approach through, one might be guided by the way the

3     guidelines usually account for two different types of conduct,

4     neither of which is a specific offense characteristic of the

5     other, which is to apply the grouping rules.

6          In fact, it would be, as a result of the consideration

7     of the 3553(a) factors, you would arrive -- if the guidelines

8     were written this way -- you would arrive at the range that

9     probation came out with.  Because that takes the adjustment off

10    of the child pornography count, but acknowledges that the count

11    one offense itself calls for serious punishment.  And the

12    conjunction of the two produces additional units, and thus you

13    would get if this (b)(5) adjustment were not in the guidelines,

14    you would get the probation office's range.

15         THE COURT:  That's interesting.  That's an awful long

16    way of getting there.

17         MR. MONTELEONI:  Well, yes.  The government's view is

18    that the range suggested by probation is perhaps somewhat lower

19    than a sentence the government thinks would be fair and

20    appropriate, but not tremendously far off.  And the government

21    believes that the guidelines are the guidelines, and they are

22    correctly calculated in the plea agreement as the Court has

23    found.

24         THE COURT:  Yes.  You've won that battle.

25         MR. BRAFMAN:  Judge, can I be heard just for a moment?

DCI3ZAUC

1          THE COURT:  You will, not just this second.  I just

2     want to hear whatever else Mr. Monteleoni wants to say on this

3     point.

4          MR. MONTELEONI:  Yes.  Also, I actually do think it is

5     very important to keep in mind this uncharged conduct suggests

6     an extremely pervasive and repetitive course of conduct that

7     just viewing it as, well, what would have happened if he had

8     just met with Minor 1, well, then if the (b)(5) enhancement

9     weren't applied, then you would be at the probation office's

10    range.  But in fact there is a lot more than that.  And then

11    there is the defendant's bail violation and other factors which

12    the government believes raise a substantial risk of recidivism.

13    So we think that would be a little on the low end.

14          THE COURT:  I thank you for that.

15          Mr. Brafman.

16          MR. BRAFMAN:  Your Honor, I am going to try to be

17    brief, and I appreciate the Court's indulgence.  But some of

18    these issues I think are too important and the Court's inquiry

19    is I think right on point.

20          But what I'm hearing Mr. Monteleoni ultimately back

21    into as a result of I think very pointed questioning by your

22    Honor is he is now I think grudgingly conceding if you sentence

23    Mr. Zauder somewhere in the range of where probation is

24    thinking it should be, that that would be enough to satisfy

25    their request for substantially above the guidelines.

DCI3ZAUC

1        As your Honor suggested earlier, and that's really the

2    telling point, it is not a lot of time extra unless you are the

3    one that's doing it.

4        But let me suggest most respectfully that what I think

5    really is probably more compelling -- there are two things that

6    are very compelling.  One is the Court's observation that on

7    the count that is the driving count or should be the driving

8    count, the guidelines would be 87 to 108 months.  This is a

9    defendant who is a first offender with an impeccable background

10   and indeed an extraordinary background in many respects.  As a

11   result, if you weren't driven by a mandatory minimum, all

12   things being equal, I might have an argument that could

13   convince your Honor to impose a guideline sentence, an 87 to

14   108 guideline sentence, which would still be substantially more

15   than he would get if he pled to this crime in New Jersey where

16   the offense actually occurred.

17       As a result of the mandatory minimum, your Honor

18   correctly notes that you could not even impose the guideline

19   sentence, and he then has to endure a three-level adjustment up

20   just to get to the mandatory minimum.

21       As your Honor notes, because of things separate and

22   apart from the offense of conviction that we're dealing with

23   under count one, he gets a three-year additional sentence than

24   the guidelines for that offense would dictate, which is a

25   substantial upward variance, departure, if you will, that

1    ordinarily would be a significant increase above the

2    guidelines.  Three additional years for someone who has no

3    background.

4           But try as Mr. Monteleoni did, and I think he tried

5    really hard, I must, if I may, read one paragraph from the

6    Dorvee opinion.  Because while the opinion is pretty

7    complicated in terms of trying to understand some of the

8    discussion by the court, with all respect to the Second

9    Circuit, the part that isn't difficult to understand at all is

10   the paragraph that appears at 616 F.3d 174, page 14 of the

11   Lexis printout where it says,"An ordinary first-time offender

12   is therefore likely to qualify for a sentence of at least 168

13   to 210 months rapidly approaching the statutory maximum based

14   solely on sentencing enhancements that are all but inherent to

15   the crime of conviction.  Consequently, adherence to the

16   guidelines results in virtually no distinction between the

17   sentences for defendants like Dorvee," a first-time offender I

18   might add, "and sentences for the most dangerous offenders who,

19   for example, distribute child pornography for pecuniary gain

20   and who fall in higher criminal history categories.  This

21   result is fundamentally incompatible with 3553(a).  By

22   concentrating all offenders at or near the statutory maximum,

23   2G2.2 eviscerates the fundamental statutory requirement in

24   3553(a) that district courts consider the nature and

25   circumstances of the offense, and the history and

DCI3ZAUC

1    characteristics of the defendant, and violates the principle

2    reinforced in Gall that the Court must guard against

3    unwarranted disparities among sentences for defendants who have

4    been found guilty of similar conduct."  It then goes on to

5    quote from Gall.

6         That is about as clear as I've ever seen from the

7    Second Circuit, and I don't think I've ever seen that type of

8    language with respect to any other series of enhancement

9    statutes.

10        THE COURT:  But what distinguishes this case is the

11   contact and the pattern of contact.

12        MR. BRAFMAN:  Yes, your Honor.

13        I would just add one thing that I think you cannot

14   overlook and which the government I think overlooks.  In our

15   submission, and when you are preparing for sentencing as a

16   serious advocate, you keep rereading the same things over and

17   over again hoping you will see something that you never saw

18   before.  To be honest with you, I did.  To my chagrin, it

19   suddenly occurred to me how telling this is.

20        In Exhibit 54 to the defendant's initial submission is

21   the diary the defendant maintained after his brother died.  As

22   the sentencing memorandum recognizes, the defendant had an

23   older brother Michael who had a genetic disorder and died at

24   the age of 28.  He died by the doctors essentially deciding to

25   remove him from what was then life-sustaining equipment,

DCI3ZAUC

1   feeling he would never recover.

2           The defendant is very bitter.  At page one of the

3   diary -- this is a diary discovered after the defendant was

4   already remanded, so he couldn't edit it or write it then.

5   This is before he was arrested, before he was remanded.  After

6   he was remanded, it was discovered.

7           In substance, the defendant says, he quotes from a

8   portion of the Bible which is the weekly portion of the moment

9   where he talks about the desert.  A place of solitude and

10  loneliness describes the new stage to which I now transition.

11  I cannot tell him, Michael, just to chat.  I cannot call him

12  just to chat.  But how do I make this transition.  And then he

13  talks about a lecture he was going to give.  If you read --

14          MR. MONTELEONI:  I'm sorry.

15          MR. BRAFMAN:  I'm sorry.  It was not the first page.

16  It doesn't have a date on it.  On the top it says -- I'll stand

17  next to you.  I'm sorry.  It is here on this page.

18          THE COURT:  I found it.

19          MR. BRAFMAN:  Your Honor, almost on every page in this

20  diary, it is the defendant talking about his abject loneliness

21  and the fact that he terribly misses his brother, and the

22  defendant was the principal caretaker for many years for his

23  brother.

24          Why do I bring that to the Court's attention.  I bring

25  it to the Court's attention because from the chronology of

DCI3ZAUC

1    events I think it is important for your Honor to note that the
2    only contact in this case occurred after his brother's death.
3    And it occurred at a time when the defendant was in a period
4    and throes of a terrible, terrible depression.  For years he
5    was interested in child pornography.  There is no record of any
6    contact prior to the spring of 2010 after his brother dies.
7    And Dr. Krueger, perhaps one of the foremost experts in the
8    field, and I'll get to the final topic in terms of the jargon.

9              THE COURT:  We're running out of time.

10             MR. BRAFMAN:  I will get to this in one second.  On
11   page 14 of his report, which appears as Exhibit 55 of our
12   initial submission, Dr. Krueger notes and considers this an
13   aberration.  And says it should be noted that Mr. Zauder
14   reported that his use of pornography, his cyber-sexual
15   behavior, and his sexual interaction with the victim, all
16   occurred after Mr. Zauder's brother had died as Mr. Zauder was
17   grieving.  It is not uncommon to see an increase in such
18   sexualized behavior as individuals cope with depression or
19   stress.  Then he goes on to say that his risk of recidivism is
20   very, very low.

21             If we're running out of time, I just want to mention
22   one thing to the Court which we submitted in our reply, is a
23   letter from Dr. Krueger on December 15, 2013, which is admitted
24   as Exhibit A.

25             Forget all the jargon.  I agree with you, sir, it is

DCI3ZAUC

very confusing, all of the different tests that the experts

impose and then analyze.  You have to be an expert in that

field to really grasp it.

THE COURT:  I'm not even sure that helps.

MR. BRAFMAN:  I'll tell you, sir, what isn't jargon.

Dr. Krueger and Meg Kaplan, Meg Kaplan in particular, spent

over 100 hours in therapy with the defendant.  Dr. Must, the

government's expert, spent two sessions with him.  From her

sessions with him, using the jargon that your Honor talks

about, she concludes based on some tests that he's a moderate

risk to reoffend.

Dr. Krueger on December 15, when we saw the

government's reply, and how they cherrypicked his initial

reports.  Both Dr. Krueger and Meg Kaplan write to the Court he

is in a low risk to reoffend.  They cite a study to you, the

only authoritative study, which demonstrates that with

treatment, and with supervision, which you get after you finish

your sentence, Evan Zauder's risk of reoffending is in the

fourth percentile.  That means that if you impose a 10-year

sentence, it is going to be at least another eight and a half

years before he even gets under supervision.  Which means they

can't predict now, Dr. Must cannot predict now for someone she

met for a couple of hours, that he's going to reoffend in 10

years from now while he's in treatment.

The people who have him in treatment, who, by the way,

DCI3ZAUC

1  used to do the reports for the department of probation and are

2  not hacks who just take a check and they write a report.  In

3  this area this is about as qualified people as you can find in

4  the United States of America.

5          THE COURT:  I've seen a lot of their reports.

6          MR. BRAFMAN:  Judge, at the end of the day, it is not

7  a science.  I can't give you a blood test and tell you what's

8  going to happen.

9          THE COURT:  No question about it.

10          MR. BRAFMAN:  You either have to rely on an expert,

11  and I've seen a lot of Dr. Must's reports when she's on the

12  government's side.  It is generally not good for the defendant.

13  I'm not suggesting she is going to fabricate a report.  This is

14  sort of guesswork.  Educated guesswork.  All I am saying is we

15  are not asking you to sentence him to time served, let him walk

16  out the door.  A 10-year sentence in a real prison is a long

17  punishment.

18          THE COURT:  I understand that.  We are going to have

19  another session to decide the sentence.  But, I'll just let

20  Mr. Monteleoni address the psychiatrist question briefly if he

21  wishes.  And then we'll deal with this on another occasion.

22          MR. MONTELEONI:  Yes, your Honor.  On that occasion

23  will I have the opportunity to be heard on the allegations that

24  we're cherrypicking or not?  Or not.

25          THE COURT:  Of course you can.

DCI3ZAUC

1          MR. MONTELEONI:  So just on the psychiatrist question,

2     then, I completely agree with Mr. Brafman.  It is not a

3     science.  This isn't a mechanical evaluation.  It is also not a

4     mechanical evaluation of résumés.  You can't just, as

5     defendant's reply suggested, say this person has these

6     credentials and therefore we have to defer to them in the face

7     of disagreement among them.

8          I think in all cases it requires a careful reading of

9     what they're saying and how consistent it is with an overall

10    pattern.

11         I think that as we set forth in our memo, the pattern

12    that Dr. Must describes of pro-offending attitudes, of a sense

13    of intellectual superiority, and essentially an attitude that

14    he can do this, he can get away with it, is actually

15    unfortunately entirely consistent with the defendant's conduct

16    first in carrying out all of this for a lengthy period of time

17    before he was arrested.  It was his first offense in that he

18    didn't get arrested beforehand.  But he actually was doing this

19    for quite some time.  Second, the defendant's actions in

20    violating his bail conditions after he had been arrested,

21    charged federally, detained for several days while his bond

22    conditions --

23         THE COURT:  I thought we were going to talk about the

24    psychiatrist.

25         MR. MONTELEONI:  I'm sorry.  My point is actually that

DCI3ZAUC

these facts are actually very strongly corroborative with

Dr. Must's conclusions, and that Dr. Kaplan's responsive letter

submitted with the defendant's initial sentencing submission

actually kind of acknowledges them, but says, well, they're not

that significant.  And Dr. Kaplan is certainly entitled to take

that view and should be taken seriously, but I think that the

Court is entitled to take a different view.  I think that's

appropriate here.

THE COURT:  Okay.  I thank you both.  I'm very glad we

did this.  It was very helpful to me.  I made a lot of progress

in my mind.  And Andy has given you a date for the sentencing.

I'm sorry it is as far out as it is, but I want to give it

appropriate thought, and I have other intervening

responsibilities that just make me more comfortable putting it

into March.  There is no question that we have a mandatory

minimum, so apart from the uncertainty -- and I don't minimize

the significance of that to the defendant -- but the fact of

the matter is he's not going anywhere in the next three months.

And apart from the uncertainty, I'll be able to give it all the

thought I want to give it if I take time.  So I will take time.

Thank you both.

MR. MONTELEONI:  Thank you.

MR. BRAFMAN:  Thank you very much.

o0o